UNITED STATES of America, Plaintiff-Appellee,

v.

Nino Rinsi CADENA, Pedro A. Ballesteros Esquebel, Gilberto Yepes Borjas, Cesar Dela Rosa, Narciso Barba Cadena, Daniel Garcia Gomez, Efrain Carreazo Cardales, Pedro Ruiz Arrieta, Jorge Lopez Wagner, Nicanor Rivera Diaz, Alajandro Valle Mantaress, Andres Gomez Ortega, and Francisco M. Ceba Bruno, Defendants-Appellants.

No. 77–5395.

United States Court of Appeals, Fifth Circuit.

Nov. 14, 1978.

Rehearing Denied Jan. 16, 1979.
See 588 F.2d 100.

Philip Carlton, Jr., Thomas A. Wills, Miami, Fla., for defendants-appellants.

Jack V. Eskenazi, U. S. Atty., Miami, Fla., Michael P. Sullivan, Asst. U. S. Atty., Mervyn Hamburg, Atty., Appellate Section, Crim. Div., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before SKELTON,* Senior Judge, and FAY and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

At the heart of this case lies the question: May the United States Coast Guard validly board a foreign vessel carrying contraband intended for delivery to this country while the vessel is in international waters, arrest its crew for conspiracy to violate the laws of the United States, and seize its cargo? Like the seas where the vessel was boarded, the problem is deep and shark-infested. Unlike them, the answer is not clearly charted. We voyage toward a conclusion:

I.

The United States Coast Guard boarded a freighter carrying a cargo of marijuana in international waters and arrested the thir-

* Senior Judge of the United States Court of Claims, sitting by designation.

teen Colombian crew members aboard. Their arrest was the culmination of an investigation that began two months before, when federal agents in Florida received a tip that Thomas Albernaz was seeking a vessel to rendezvous with a freighter on the high seas, to receive a large quantity of marijuana from it, and to deliver the shipment to shore in Florida. During the following weeks, Drug Enforcement Administration agents plotted with Albernaz and others to supply such a vessel. The trial of Albernaz and his co-defendants and the onshore facts of this case are considered in a separate opinion, *United States v. Rodriguez*, 5 Cir. 1978, 585 F.2d 1234.

After some difficulty, the vessel, Catchalot II, which was secretly provided by the government, found the freighter, the Labrador, on the high seas, about 200 miles off the Florida coast, and signaled a pre-arranged code to it. Appellant Cadena, the master of the Labrador, and the only English-speaking person aboard, declared that he had 1000 bales of marijuana (containing 50 pounds each) to deliver and requested payment of $1000 in cash. Cadena permitted his crew members, who are also appellants herein, to unload 150 bales of the marijuana during daylight hours after protesting that he had "never done anything like this before in daylight."

The Coast Guard vessel, Dauntless, was summoned by the Catchalot II, and arrived on the scene that evening. It hailed the freighter in Spanish and English. Cadena immediately called to the Catchalot II on the Labrador's citizen band radio "Shark! Shark!", a pre-arranged warning signal indicating the presence of law enforcement officers in the vicinity. The Labrador ignored the Dauntless' signals and continued to sail away. Only after the Dauntless resorted to two three-round bursts of machine gun fire and a volley from its cannon did the freighter stop and permit the Coast Guard to board.

The boarding party found plastic and burlap sacks in the holds containing about 54 tons of marijuana. They found a 1975 Canadian registration certificate and a 1976 Colombian certificate indicating that the ship had been inspected for rats. The freighter was sailing without lights; it had shown no flag by day and it was flying none when it hove to. During the chase its crew members had been seen discarding papers and small packages into the ocean.

Appellants were convicted of both counts of a two count indictment charging a conspiracy to import marijuana into the United States in violation of 21 U.S.C. § 963 and a conspiracy to distribute marijuana within the United States in violation of 21 U.S.C. § 846. Appellants challenge those convictions on a number of grounds but focus their fire on the legality of the search and seizure of the vessel. Appellants in the companion case, *United States v. Rodriguez, supra*, also challenge the search.

II.

Appellants' manifold objections to the search and seizure reduce to several contentions: there was no authority, statutory or otherwise, for seizing, boarding and searching a foreign vessel in international waters; if authority existed, the search and seizure nonetheless violated the Convention on the High Seas [1] which overrides any domestic law to the contrary; the Fourth Amendment was violated because no warrant was obtained and because the lack of authority for the search and the violation of the Treaty rendered the search unreasonable for Fourth Amendment purposes. We separately consider and reject each of these theories.

A. *Authority for Searching Vessels*

■■■■ The Coast Guard [2] is empowered to search and seize any vessel on the high

---

1. 450 U.N.T.S. 82, 13 U.S.T. 2312, T.I.A.S. No. 5200.

2. 14 U.S.C. § 2 establishes the Coast Guard as the primary maritime agency charged with the enforcement of federal law at sea and sets forth the primary duties of the Coast Guard. It provides in relevant part:

The Coast Guard shall enforce or assist in the enforcement of all applicable Federal laws on

seas that is subject to the jurisdiction or operation of any law of the United States. 14 U.S.C. § 89(a).[3] This provision authorizes seizures and searches of domestic vessels on the high seas.[4] *United States v. Warren,* 5 Cir. en banc 1978, 578 F.2d 1058; *United States v. Odom,* 5 Cir. 1976, 526 F. 2d 339; *United States v. One (1) 43 Foot Sailing Vessel "Winds Will",* 5 Cir. 1976, 538 F.2d 694; *United States v. Hillstrom,* 5 Cir. 1976, 533 F.2d 209, *cert. denied,* 1977, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749; *Cf. United States v. Winter,* 5 Cir. 1975, 509 F.2d 975, 983–984 n. 30. The Constitution does not forbid such action. *See, e. g., United States v. Lee,* 1927, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202; *Maul v. United States,* 1927, 274 U.S. 501, 47 S.Ct. 735, 71 L.Ed. 1171.

The statute is not, on its face, limited to domestic vessels or domestic waters. It contemplates that vessels on the high seas will, under some circumstances, be subject to the "jurisdiction, or to the operation of any law, of the United States," for it specifically provides for "searches, seizures, and arrests upon the high seas *and* waters over which the United States has jurisdiction" (emphasis added).[5] Because the Act does not further define those vessels that may be seized and searched, we must determine the scope of that clause. This requires a brief excursus into the waters of jurisdiction over the *offense,* an issue that is relevant to the authority, *vel non,* for the *search.*

## B. Jurisdiction Over the Offense

That the vessel was outside the territorial waters does not, of course, mean that it was beyond United States jurisdictional limits or the operation of domestic law. Jurisdictional and territorial limits are not co-terminous. The nation has long asserted the objective view, under which its jurisdiction extends to persons whose acts have an effect within the sovereign territory even though the acts themselves occur outside it. *Ford v. United States,* 1927, 273 U.S. 593, 620, 47 S.Ct. 531, 540, 71 L.Ed. 793, 805; *United States v. Winter, supra,* 509 F.2d at 980–982; *United States v. Fernandez,* 5 Cir. 1974, 496 F.2d 1294; *Rivard v.*

and under the high seas and waters subject to the jurisdiction of the United States; shall administer laws and promulgate and enforce regulations for the promotion of safety of life and property on and under the high seas and waters subject to the jurisdiction of the United States . . .; shall develop, establish, maintain, and operate, with due regard to the requirements of national defense, aids to maritime navigation, icebreaking facilities, and rescue facilities for the promotion of safety on, under, and over the high seas and waters subject to the jurisdiction of the United States; . . . and shall maintain a state of readiness to function as a specialized service in the Navy in time of war.

3. 14 U.S.C. § 89(a) provides in relevant part: The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When

from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested . . .; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture . . . such vessel or such merchandise, or both, shall be seized.

4. For definitions of the three divisions of the water- internal waters, territorial sea and high seas- see Carmichael, At Sea with the Fourth Amendment, 32 U. Miami L.Rev. 51, 56–59 (1977).

5. Article 24 of the Convention on the Territorial Sea and Contiguous Zone, 1958, 15 U.S.T. 1606, T.I.A.S. No. 5639, 516 U.N.T.S. 205, to which the United States is a party is not raised here. It has been suggested elsewhere, *see United States v. Winter, supra,* 509 F.2d at 983–984 n.30 that the Convention may limit the term "high seas and waters over which the United States has jurisdiction" to the 12 miles from the coast. *See* Ficken, *supra,* 29 U. Miami L.Rev. at 713–727.

*United States,* 5 Cir. 1967, 375 F.2d 882, 886, *cert. denied,* 1967, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181; *Marin v. United States,* 5 Cir. 1965, 352 F.2d 174; Carmichael, At Sea with the Fourth Amendment, 32 U. Miami L.Rev. 51, 64 (1977).[6]

In *United States v. Winter, supra,* therefore, we sustained jurisdiction over a conspiracy involving two non-resident aliens who were arrested on the high seas, had never entered the United States or its territorial limits, but had participated in a conspiracy to import marijuana into the United States by serving as crew members. 509 F.2d at 983. *See also Rivard, supra.* In *Winter,* as here, there was proof of overt acts committed within the territorial United States by at least one co-conspirator.[7] *See* Ficken, The 1935 Anti-Smuggling Act Applied to Hovering Narcotics Smugglers Beyond the Contiguous Zone: An Assessment Under International Law, 29 U. Miami L. Rev. 700, 701 n. 5 (1975) on whether crimes defined in the Comprehensive Drug Abuse Prevention and Control Act of 1970[8] fall within the United States special maritime and territorial jurisdiction.

### C. *Authority for the Search*

■ However, because the court did not determine the validity of the search of a foreign vessel on the high seas, *Winter* does not sound bottom for us. Jurisdiction over the crime does not necessarily imply jurisdiction over the vessel that is being used to accomplish it.

No statute has been cited to us by the United States, despite an opportunity for reconsidering the issue, and we have found none, expressly asserting "jurisdiction" over the vessel by the United States, to be enforced either by the Coast Guard or any other domestic force. The anti-smuggling statute, 19 U.S.C. § 1701 permits the President to declare portions of the high seas to be customs enforcement areas.[9] *See* Ficken, *supra.* Customs enforcement under 19 U.S.C. § 1581[10] extends to jurisdictional

---

**6.** *See also United States v. Pizzarusso,* 2 Cir. 1968, 388 F.2d 8, *cert. denied,* 1968, 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395; *Rocha v. United States,* 9 Cir. 1961, 288 F.2d 545, *cert. denied,* 1961, 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241; Restatement (Second) of the Foreign Relations Law of the United States § 33 (1965) (suggesting that a state may prescribe a rule of law attaching legal consequences to conduct outside its territory that merely threatens its security).

**7.** The appellants were charged in the same indictment with appellants in the companion case, *United States v. Rodriguez,* 5 Cir. 1978, 585 F.2d 1234. A number of the overt acts charged and proved concerned meetings among the defendants who were tried separately and that occurred on land. The fact that none of the appellants who were tried in this case is charged with an overt act on land merely results from the fortuity of a bifurcated trial and is not decisive.

**8.** 21 U.S.C. §§ 801–803, 811, 812–829, 841–851, 871–886, 901–904, 951–966.

**9.** A customs enforcement area created under 19 U.S.C. §§ 1701, 1703–11 may extend up to 62 miles outward from the coast and laterally up to 100 miles in each direction, thus creating a rectangular enforcement zone of 200 miles by 62 miles.

**10.** 19 U.S.C. § 1581 states in relevant part: (a) Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under the Anti-Smuggling Act, [19 U.S.C. §§ 70, 1401 et seq., 1581 et seq., 1701 et seq.; 46 U.S.C. §§ 60 et seq., 277 et seq.;] or any other authorized place without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.
(b) Officers of the Department of Commerce [Treasury] and other persons authorized by such department may go on board of any vessel at any place in the United States or within the customs waters and hail, stop, and board such vessel in the enforcement of the navigation laws . . ..
\* \* \* \* \* \*
(e) If upon the examination of any vessel or vehicle it shall appear that a breach of the laws of the United States is being or has been committed so as to render such vessel or vehicle, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel or vehicle, liable to forfeiture or to secure any fine or penalty, the same shall be seized and any person who has engaged in such breach shall be arrested.

limits defined in 19 U.S.C. § 1401(j) (12 miles or as permitted by treaty). *See* Carmichael, *supra,* at 53 n. 9, 60–61, 65–75. The "special maritime and territorial jurisdiction of the United States" set forth in 18 U.S.C. § 7 extends to the high seas, but does not cover foreign vessels. *United States v. Holmes,* 1820, 18 U.S. (5 Wheat.) 412, 5 L.Ed. 122. *See also, United States v. Davis,* 1837, C.C.D.Mass., 25 F. Cas. 786 (No. 14,932); *United States v. Jackson,* 1843, C.C.S.D.N.Y., 26 F. Cas. 558 (No. 15,457). None of these extends jurisdiction to a foreign vessel in the area where the Labrador was boarded, which was over 200 miles from shore.

█ Without aid from any other jurisdictional statute, then, the authority of the Coast Guard to act upon the high seas must depend upon whether a vessel sailing there is "subject to . . . the operation of any law, of the United States." 14 U.S.C. § 89(a). The defendants were engaged in a violation of the domestic conspiracy statute, 21 U.S.C. § 963, which we have applied extraterritorially and to non-resident aliens. *Winter, supra.* The Coast Guard detained the vessel and searched it to detect and prevent a violation of the laws of the United States, thus acting in accordance with the purpose of the statute as set forth in its opening sentence.[11]

Because importation necessarily originates in an act in a foreign country, it is apparent that Congress intended that 21 U.S.C. § 952 and § 963 apply to persons who commit acts or a series of acts that at least commenced outside the territorial limits of the United States. *See Winter, supra; See also United States v. Bowman,* 1922, 260

U.S. 94, 97–98, 43 S.Ct. 39, 41, 67 L.Ed. 149. Moreover, as noted previously, others who were co-conspirators with these defendants committed acts in furtherance of the conspiracy within these territorial limits. We find statutory authority for the search and seizure implicit in 14 U.S.C. § 89(a) by virtue of its application to the search and seizure of vessels and individuals on the high seas if they are "subject . . . to the operation of any law, of the United States."[12]

### D. *Jurisdiction Over the Person*

█ Because a defendant in a criminal trial may not challenge the court's jurisdiction over his person on the ground that his presence was unlawfully secured, *Winter, supra,* 509 F.2d at 983–989, we need not determine the validity of the arrest of the defendants outside of territorial waters, *id.* at 983–84, n. 30, or whether the construction of 14 U.S.C. § 89(a) adopted with respect to the search and seizure would apply with respect to the arrest of individuals aboard the vessel.

### E. *Effect of the Convention On the High Seas*

█ It is generally settled that, whether he is an alien or a citizen, even a person abducted from beyond the territorial limits of the United States may not successfully challenge the jurisdiction of the trial court over his person on the grounds that his presence was unlawfully secured. *See United States v. Winter, supra,* 509 F.2d at 986–989, discussing *Frisbie v. Collins,* 1952, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541; *Ker v. Illinois,* 1886, 119 U.S. 436, 7 S.Ct.

---

* * * * * *

(g) Any vessel, within or without the customs waters, from which any merchandise is being, or has been, unlawfully introduced into the United States by means of any boat belonging to, or owned, controlled, or managed in common with, said vessel, shall be deemed to be employed within the United States and, as such, subject to the provisions of this section.

* * * * * *

**11.** *But see* note 22 *infra.*

**12.** We need not consider whether Congress intended to reach a conspiracy involving only persons physically outside the United States and having as its objection only the commission of acts outside its territory. Obviously, we do not touch upon whether the statute would apply to acts committed by non-resident aliens within their own states, or whether there is authority to arrest citizens or non-resident aliens while they reside in a foreign country.

225, 30 L.Ed. 421.[13] As to the rights of aliens, see *United States v. Winter, supra; United States v. Herrera,* 5 Cir. 1974, 504 F.2d 859, 860.

If an arrest is made in clear violation of a treaty limiting the right of the United States to board vessels of other sovereign nations and a timely plea contesting jurisdiction is made, then the court will, for purposes of giving force to the treaty, dismiss the indictment. *Ford v. United States, supra* (no timely objection); *United States v. Winters, supra,* 509 F.2d at 988–989 (dictum); *United States v. Schouweiler,* S.D. Cal.1927, 19 F.2d 387; *United States v. Ferris,* N.D.Cal.1927, 19 F.2d 925; *See also Cook v. United States,* 1933, 288 U.S. 102, 121–122, 53 S.Ct. 305, 312, 77 L.Ed. 641 (no jurisdiction over the vessel). Here, the motion contesting jurisdiction, although made after a plea, *cf. Ford v. United States, supra* was timely; the strict pleading requirements in *Ford,* if still viable, were satisfied by an order of the court extending the time for pretrial motions. The court's obligation to give effect to a binding treaty may also require suppression of any evidence seized in violation of it, *see Cook v. United States, supra,* whether or not that same violation mandates suppression for Fourth Amendment reasons. But there is no authority for dismissal of the indictment in the absence of a clear violation of a treaty. *Winter, supra.*

The Convention on the High Seas, 450 U.N.T.S. 82, 13 U.S.T. 2312, T.I.A.S. No. 5200, is a codification of international law,[14] and a treaty that purports to be binding upon all signatories. It prohibits the boarding of a foreign merchant ship on the high seas by a warship unless there are reasonable grounds for suspecting that the ship is engaged in piracy, slave trade, or, although flying a foreign flag or refusing to show its flag,[15] is of the same nationality as the warship. Article 22, Convention on the High Seas.[16] The Convention of 1958, if applicable, supersedes prior domestic law to the contrary, *Cook v. United States, supra,* including the authority provided by 14 U.S.C. § 89(a) (enacted in 1949).[17] *See also Chae Chan Ping v. United States* (The Chinese Exclusion Case), 1889, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068. If applicable, its express terms were violated by the search, seizure and arrest.

Neither Canada nor Colombia is a party to the Convention. In *United States ex rel. Lujan v. Gengler,* 2 Cir. 1975, 510 F.2d 62, 67, *cert. denied,* 1975, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668, a case involving abductions from foreign soil, the Second Circuit adopted the view that only

---

**13.** This rule is subject to an exception in cases of outrageous governmental conduct involving emotional and physical brutality, *United States v. Toscanino,* 2 Cir. 1974, 500 F.2d 267.

**14.** The preamble to the Convention on the High Seas states:

The States Parties to this Convention desiring to codify the rules of international law relating to the high seas recognizing that the United Nations Conference on the Law of the Sea, held at Geneva from 24 February to 27 April 1958, adopted the following provisions as generally declaratory of established principles of international law.

**15.** Nationless ships are not afforded protection under the treaty, *see* Article 6, C.H.S.; and ships are deemed to have the "nationality of the state whose flag they are *entitled* to fly." Article 5, C.H.S. (emphasis added). *See* Restatement (Second) of The Foreign Relations Law of the United States § 28 and Comment (b) (1965). *See also* Oppenheim's International Law 546 (7th ed. 1948); *Molvan v. Attorney*

*General for Palestine,* 1948 Law Reports (A.C.) 351. There was testimony by the Coast Guard operation officer that the law does not require the flying of flags at night (when the ship was arrested). Although the flags of several nations were found on board, the Coast Guard officer testified that it is customary for a ship to fly the flag of a nation as it enters that nation's port. Hence, we may not conclude as a matter of law that the vessel was a nationless one.

**16.** The government concedes that for these purposes, the Coast Guard vessel is a warship. *See Maul v. United States,* 1927, 274 U.S. 501, 512–531, 47 S.Ct. 735, 739–46, 71 L.Ed. 1171 (Brandeis, J., concurring); Carmichael, *supra,* 32 U. Miami L.Rev. at 52 n. 6.

**17.** *Cook* involved the Treaty of May 22, 1924, 43 Stat. 1761, and § 581 of the Tariff Act of 1922, 19 U.S.C. § 1581; its reasoning is equally applicable here.

signatory nations to a treaty, and not their individual citizens, can protest its violation. *See also* Restatement (Second) of the Foreign Relations Law of the United States, § 1 comment (f), and § 115 comment (e) (1965). Even if individuals have standing to raise treaty violations, their personal rights are derived from the rights of a signatory state. Article 32 of the Convention provides that it is subject to ratification,[18] and, although representatives for both Canada and Colombia signed the Convention, neither country has ratified it. *See* Treaties in Force (1978) at 326; 13 U.S.T. 2312; British Institute of International and Comparative Law, Developments in the Law of the Sea 1958–1964 at 43 (1965); 6A Benedict on Admiralty at 567–568 and 1977 supplement thereto. The treaty is not an act of disinterested benevolence for the peoples of the world. There is no indication in the treaty, or elsewhere, that it was intended to confer rights on non-member nations or on vessels of non-member nations, let alone on citizens of non-member nations. *Compare Edye v. Robertson,* 1884, 112 U.S. 580, 598–99, 5 S.Ct. 247, 254, 28 L.Ed. 798; Restatement (Second) of the Foreign Relations Law of the United States § 139(a) (1965); *See, e. g.,* The Vienna Convention on The Law of the Treaties, Art. 36 (May 23, 1969).

Appellants contend that, because the treaty merely restates, as it recites, principles of international law, they have standing to assert those underlying doctrines that are part of the corpus juris of nations. *But see United States ex rel. Lujan v. Gengler, supra,* 510 F.2d at 68; Restatement (Second) of the Foreign Relations Law of the United States, § 1 comment (f), § 175 (1965). Even if we accept these premises, there is no basis for concluding that violation of these international principles must or should be remedied by application of the exclusionary rule or by dismissal of the indictment unless Fourth Amendment interests are violated. Indeed

that would be a singular application for none of the other signatory nations appears to have a similar exclusionary rule or to attach such consequences to a violation of the Convention.

The violation of international law, if any, may be redressed by other remedies and does not depend upon the granting of what amounts to an effective immunity from criminal prosecution to safeguard individuals against police or armed forces misconduct. Article 22 of the Convention, for example, specifies the right to compensation for damages suffered as a consequence of its violation; if only this remedy is available to citizens or vessels of member nations, citizens of non-member nations ought not enjoy the benefits of greater prophylaxis, such as exclusion or dismissal of indictments, by virtue of their nation's failure to ratify. In the absence of a foreign state's ratification that would ensure reciprocal respect for these principles of international law, neither comity, domestic law, nor concepts of due process and fundamental fairness, require such a purging. *See United States ex rel. Lujan v. Gengler, supra,* 510 F.2d at 68 n. 9. Indeed, such unilateral enforcement of the terms of the treaty with respect to non-member nations might ultimately undermine its effectiveness by reducing the incentive for ratification. Congress or the Executive might decide that this nation should unilaterally enforce those principles, but, in the absence of such a directive, we find no authority for granting the relief requested.

## F. *The Fourth Amendment*

Finally, appellants contend that the Fourth Amendment was violated by the failure to procure a warrant; alternatively it is suggested that, because international law was violated by the search and seizure, the actions of the Coast Guard were unrea-

---

18. Article 34(2) of the Treaty provides:

For each State ratifying or acceding to the Convention after the deposit of the twenty-second instrument of ratification or accession,

the Convention shall enter into force on the thirtieth day after deposit by such State of its instrument of ratification or accession.

sonable and violated the Fourth Amendment.[19]

■ Although the search and seizure were authorized by 14 U.S.C. § 89(a), this does not establish that the government's conduct, or that law, are not in violation of the Fourth Amendment. *Almeida-Sanchez v. United States*, 1973, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596. The Fourth Amendment prohibits unreasonable searches and seizures and the issuance of warrants but upon probable cause.[20] Its applicability is not limited to domestic vessels or to our citizens; once we subject foreign vessels or aliens to criminal prosecution, they are entitled to the equal protection of all our laws, including the Fourth Amendment. *United States v. Winter, supra; Noro v. United States*, 5 Cir. 1945, 148 F.2d 696, 698, *cert. denied*, 1945, 326 U.S. 720, 66 S.Ct. 25, 90 L.Ed. 426; *See also Reid v. Covert*, 1957, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148; *Harisiades v. Shaughnessy*, 1952, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586; *Williams v. Blount*, D.D.C.1970, 314 F.Supp. 1356.

The Fourth Amendment issue may per se involve logical circularity: if there is probable cause for a warrant, the issue of the jurisdiction of a magistrate to issue a warrant for a search in international waters must be considered. *See* Rule 41(a), Fed.R. Crim.Pro. To assume the magistrate's authority assumes jurisdiction over the vessel; to assume a lack of authority would lead either to the conclusion that no warrant was needed or that it was impossible to make a valid search. For purposes of this opinion, we assume that there was jurisdiction over the vessel, as we have decided, and, *arguendo*, that a warrant might validly have been issued. *See Berlin Democratic Club v. Rumsfeld*, D.D.C.1976, 410 F.Supp. 144, 160.

■ In general, warrantless searches are unlawful even if made with probable cause. *South Dakota v. Opperman*, 1976, 428 U.S. 364, 96 S.Ct. 3092, 3103, 49 L.Ed.2d 1000; *Agnello v. United States*, 1925, 269 U.S. 20, 33, 46 S.Ct. 4, 6, 70 L.Ed. 145. The Constitution requires the "deliberate, impartial judgement of a judicial officer," *Opperman, supra*, rather than a decision "by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 1948, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436. *See Aguilar v. Texas*, 1964, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723. Prior determinations by judicial officers ensure that the record existing at the time of the decision is accurately preserved and enhance meaningful review.

■ However, in a variety of exceptional circumstances, a warrant is not prerequisite to a valid search. We have specifically sustained the constitutionality of an inspection, made without a warrant or probable cause pursuant to 14 U.S.C. § 89(a), of United States flag vessels, but implied that this exception is permissible only with respect to domestic vessels because of the special interest of the nation in the conduct and operation of its citizens' vessels.[21] *United States v. One (1) 43 Foot Sailing Vessel "Winds Will"*, S.D.Fla.1975, 405 F.Supp. 879, 882, *aff'd per curiam*, 5 Cir.

---

**19.** For a useful examination of the Fourth Amendment jurisprudence respecting automobile searches, administrative searches, and border searches, and its applicability to searches at sea, see Carmichael, *supra*, 32 U.Miami L.Rev. at 81–90.

**20.** The Fourth Amendment provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**21.** Because the search did not take place in territorial waters, and our borders were not crossed, the jurisprudence respecting border searches is inapplicable. *See United States v. Stanley*, 9 Cir. 1976, 545 F.2d 661; *United States v. Brennan*, 5 Cir. 1976, 538 F.2d 711, *cert. denied*, 1977, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538; *United States v. Tilton*, 9 Cir. 1976, 534 F.2d 1363; *United States v. Jones*, 9 Cir. 1975, 528 F.2d 303, *cert. denied*, 1976, 425 U.S. 960, 96 S.Ct. 1745, 48 L.Ed.2d 206; *United States v. Ingham*, 5 Cir. 1974, 502 F.2d 1287, *cert. denied*, 1975, 421 U.S. 911, 95 S.Ct. 1566, 43 L.Ed.2d 777.

1976, 538 F.2d 694. Additionally, we have indicated that the Coast Guard has authority to search a domestic vessel for safety, documentary purposes and "to look for obvious customs and narcotics violations". *United States v. Warren, supra,* 578 F.2d at 1065.[22]

■ Here, the government clearly had probable cause to search.[23] Appellants do not contest this, but contend instead that probable cause existed several days before the search; hence there could be no exigent circumstances that would excuse the failure to secure a warrant. *See United States v. Robinson,* 1976, 174 U.S.App.D.C. 351, 355 n. 9, 533 F.2d 578, 582 n. 9, indicating that with respect to automobiles, probable cause must be accompanied by exigent circumstances or another exception to the warrant requirement.[24] Had the Coast Guard vessel been waiting in ambush for the foreign vessel, and seized it *only* on the basis of information known to it for a considerable length of time without exigent circumstances, its failure to obtain a prior warrant would be of greater significance. But here the validity of the seizure is not dependent upon the facts known to government agents before the Labrador made its rendezvous with the Catchalot II.

The location of the Labrador was uncertain, and it was difficult to determine where it and the Catchalot II would converge. As the facts recited in *Rodriguez, supra,* show, even the masters of these two vessels had difficulty effecting their tryst. It was impossible for the government agents to know in advance where the vessels would meet. There was no way to await their union without being seen.

■ Upon encountering the vessel, the Coast Guard conveyed a "heave to" message via international signal flags. It was authorized to stop the vessel by 14 U.S.C. § 89, and such a stop was justified by the existence of probable cause.[25] The vessel began to flee, and stopped only after cannon and machine gun fire traversed its bow. This attempted flight created exigent circumstances if none existed previously.

■ We need not consider whether a warrantless search would otherwise have been constitutionally infirm; considering the mobility of vessels, it suffices that, as the facts unfolded, the government's conduct was justified by the circumstances present when it occurred.[26] Until the search and seizure were made, the failure to obtain the warrant was but an inchoate error without effect on individual rights; at the time of the search and seizure, there was justification for proceeding without a warrant. As the Supreme Court held in *Cardwell v. Lewis,* 1974, 417 U.S. 583, 595, 94 S.Ct. 2464, 2472, 41 L.Ed.2d 325:

**22.** Judge Fay dissented in the en banc decision in *Warren,* but reluctantly considers the majority views binding upon us.

**23.** Although Section 89(a) provides authority for the search of a foreign vessel, there is no reason for the Coast Guard to conduct safety or documentation inspections of foreign vessels on the high seas. If we assume both that the Fourth Amendment protects non-resident aliens on a foreign vessel and that, if it does, they can invoke the exclusionary rule, the existence of probable cause to believe that a crime subject to the operation of the laws of the United States has been, or is being, committed would justify the search of a foreign vessel on the high seas. This standard is satisfied here. We need not consider whether it is permissible to conduct a safety or documentation search of a foreign vessel in domestic waters, nor need we consider the standards governing safety and documentary inspections

of domestic vessels either in domestic waters or upon the high seas.

**24.** Under *Texas v. White,* 1975, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209, if a warrantless search of a vehicle is permissible at the time of detention, it remains permissible notwithstanding an intervening opportunity to procure a warrant. As to the analogy of automobile searches to vessel searches, see Carmichael, *supra,* 32 U. Miami L.Rev. at 81–83.

**25.** An arrest without a warrant may be made if the arresting officer had probable cause to believe that the arrestee has or is committing a felony. *Draper v. United States,* 1959, 358 U.S. 307, 314, 79 S.Ct. 329, 333, 3 L.Ed.2d 327.

**26.** The full search was too broad in scope to be justified as a search incident to arrest which must be limited to the area from which the arrestee might obtain a weapon or something that could be used as evidence against him.

Exigent circumstances with respect to vehicles are not limited to situations where probable cause is unforeseeable and arises only at the time of arrest. [Citation omitted.] The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action.[27] *See also United States v. Mitchell*, 5 Cir. 1976, 538 F.2d 1230, 1233, 5 Cir. en banc, 1976 *cert. denied*, 1977, 430 U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792.

 We assume, *arguendo*, that principles of international law were violated by the search and seizure of the vessel, *cf.* Restatement (Second) of the Foreign Relations Law of the United States, § 165 (1965). It does not inexorably follow that the government's actions were unreasonable for Fourth Amendment purposes. The principles, if any, that were violated by the government's actions are not intended to secure the rights of privacy but rather of free navigation of international waters. *See* Article 2, Convention on the High Seas. Whether the search and seizure were Fourth-Amendment-unreasonable must be established by showing that the interests to be served by the Fourth Amendment were violated, and not merely by establishing the violation of general principles of international law.[28]

Accordingly, we affirm the trial court in denying the appellants' motions to suppress.[29]

Chimel v. California, 1969, 395 U.S. 752, 768, 89 S.Ct. 2034, 2043, 23 L.Ed.2d 685; *see also United States v. Robinson*, 1973, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427.

27. We intimate no view with respect to whether we would apply the exclusionary rule in similar circumstances if the object of the search were one in which the privacy interest is stronger such as in the search of a home or of personal effects. *See South Dakota v. Opperman, supra*, 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000, 1004 (". . . warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not"). The search did not involve private living quarters or personal belongings, but common areas of the ship.

28. For example, if an officer violates the federal "knock and announce" statute, 18 U.S.C.

## III. *Other Contentions*

 Appellants were not prejudiced by the prosecution's display of several bales of marijuana which were marked for identification and clearly admissible, but were inadvertently never introduced into evidence. *United States v. Bringhurst*, 5 Cir. 1972, 468 F.2d 604, 605, *cert. denied*, 1973, 410 U.S. 938, 93 S.Ct. 1399, 35 L.Ed.2d 603. *Compare* the display of inadmissible evidence in *United States v. Kwitek*, 7 Cir. 1970, 433 F.2d 18 and *United States v. Reid*, 7 Cir. 1969, 410 F.2d 1223; *see also United States v. Lawson*, 7 Cir. 1974, 507 F.2d 433, *cert. denied*, 1975, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762. The nature and identification of the substance was clearly established. Nor was prejudicial error committed by permitting introduction of the parties' joint stipulation to the chemical analysis of the samples notwithstanding the failure to introduce them. The stipulation was properly put before the jury. *United States v. Cantu*, 5 Cir. 1975, 510 F.2d 1003, 1004. If proof of the nature of the prohibited substance is made beyond reasonable doubt, the substance itself need not be put in evidence. *United States v. Crisp*, 5 Cir. 1977, 563 F.2d 1242, 1244; *United States v. Quesada*, 5 Cir. 1975, 512 F.2d 1043, 1045, *cert. denied*, 1975, 423 U.S. 946, 96 S.Ct. 356, 46 L.Ed.2d 277, and cases cited therein.

 Permitting the jury to use a seating chart prepared by the prosecuting

§ 3109, in conducting a search of a home, the search is unreasonable and its fruits are inadmissible, *Sabbath v. United States*, 1968, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828, because the statute is designed to serve Fourth Amendment interests; if the officer violated a speeding statute, or a regulation with force of law prohibiting use of a particular firearm in making the arrest, suppression is not warranted because the conduct, although violative of law, is not unreasonable for Fourth Amendment purposes.

29. There is no suggestion that the arrests and appellants' treatment after the arrests did not satisfy international standards of procedural justice. *See* Restatement (Second) of the Foreign Relations Law of the United States, § 179 (1965).

attorney,[30] showing the names and pictures of the appellants in the order in which they sat during trial, did not constitute prejudicial error. Identity, like fingerprints or blood samples, may be established by testimony. *Delegal v. United States,* 5 Cir. 1964, 329 F.2d 494, *cert. denied,* 1964, 379 U.S. 821, 85 S.Ct. 44, 13 L.Ed.2d 32. The identity of each defendant was properly proved. Had the jury found some of the defendants not guilty, then the accuracy of the chart might have had an impact on their verdict. No defendant was prejudiced by the chart because the jury found all guilty alike.

■ The defendants also contest the sufficiency of the evidence to sustain the verdict. With respect to the conspiracy to import charge, the evidence presented by the prosecution on direct was outlined in Part I. Cadena communicated by radio with the Catchalot II, speaking English. He arranged the meeting of the two vessels. He agreed reluctantly to transfer the cargo in daylight saying that this was the first time he had ever done something like this in the daytime. He demanded a cash payment. The Catchalot II bore the designation West Palm Beach below its name. There was also evidence that the cargo had a characteristic smell of marijuana. The crew participated in the transfer of 150 bales of the cargo. The clandestine nature of the operations made it apparent that the voyage was for some illegal purpose.

As part of their defense, Cadena and the members of the crew testified that they did not speak or understand English. As to Cadena, there was, of course, testimony to the contrary. The defense attempted to counter the prosecution case by the testimony of Cadena and one crew member to the effect that neither Cadena nor the crew knew the purpose of the voyage when they started it, and they were compelled at gunpoint to take the contraband aboard at Venezuela. Initially, the crew and Cadena thought the contraband was coffee to be

smuggled abroad; the next day, after the gunman left, Cadena and some of the crew examined the cargo and learned that it was not coffee, but they never knew what it was. They never knew the cargo was destined for the United States. But they continued on the voyage north for 45 days to the rendezvous point without apparent compulsion. They knew they were engaged in some illicit operation, but thought they were smuggling an unknown commodity into the Bahamas or Canada.

The jury might have considered all of this defense evidence as an inventive effort to fabricate some explanation for the admittedly unlawful activity that would free it from the taint of conspiracy to import marijuana into the United States. The jury might have concluded that the destination of the cargo was obvious from the vessel's course, and the apparent nationality of the Catchalot II and its crew. It might reasonably have concluded that the crew became aware that the cargo was marijuana at least when they assisted in transferring it to the Catchalot II. *See United States v. Alvarez,* 5 Cir. 1977, 548 F.2d 542, 544 (presence of seven men unloading bales of marijuana on the banks of the Rio Grande established existence of conspiracy).

The only evidence that the defendants did not know the purpose of their mission when the voyage commenced, and did not knowingly engage in a conspiracy to import marijuana to the United States came on defense from the lips of Cadena and one crew member. Much of Cadena's testimony was directly contradicted by the testimony of other witnesses for the prosecution. It is evident that none of crew was a master member of the venture, but there was evidence sufficient for the jury to believe that they participated knowingly in it, at least at its terminus.

■ Those who join an ongoing conspiracy are responsible for its full course. *United States v. Wilson,* 5 Cir. 1974, 500

---

**30.** Appellant Cadena prepared a chart while he was in custody. This was not submitted to the jury but was used to verify the accuracy of the prosecutor's chart.

F.2d 715, 727, *cert. denied,* 1975, 420 U.S. 977, 95 S.Ct. 1403, 43 L.Ed.2d 658; *United States v. Reynolds,* 5 Cir. 1975, 511 F.2d 603. There was sufficient evidence to support the conclusion that, by the time the cargo was transferred to the Catchalot II, the crew knew that there was marijuana aboard and that it was destined for the United States. Once the existence of a conspiracy and the defendant's participation in it are both established, slight evidence of the defendant's knowledge of the scheme may be sufficient to sustain the jury's finding that he or she was a member. *E. g., United States v. Evans,* 5 Cir. 1978, 572 F.2d 455, 469; *United States v. Trevino,* 5 Cir. 1977, 556 F.2d 1265, 1268; *United States v. Barnard,* 5 Cir. 1977, 553 F.2d 389, 393; *United States v. Alvarez,* 5 Cir. 1977, 548 F.2d 542, 544. *See United States v. Dunn,* 9 Cir. 1977, 564 F.2d 348, 357 n. 21. The pre-arranged code and other communication between Cadena and the Catchalot II provided proof that there was an agreement between the land conspirators and the conspirators on the vessel although each member may not have known the entire scope of the conspiracy or the identity of the other co-conspirators. *United States v. Bolts, supra,* 558 F.2d at 328; *United States v. Netterville,* 5 Cir. 1977, 553 F.2d 903, 912, *cert. denied,* 1978, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752; *United States v. Avalos,* 5 Cir. 1976, 541 F.2d 1100, 1118, *cert. denied,* 1977, 430 U.S. 97, 97 S.Ct. 1656, 52 L.Ed.2d 363. The crew members participated in transferring a cargo they knew to be contraband, and that the jury may have been satisfied they knew to be marijuana, to the Catchalot II, off United States shores. Unlike the situation in *United States v. Falcone,* 1940, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128, these defendants knew of the conspiracy that they facilitat-

ed; they supplied an illegal substance, not an article of free commerce. *See Direct Sales Co. v. United States,* 1943, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674.[31]

■ Because the crew members, other than Cadena, were accorded concurrent sentences,[32] we need not consider the sufficiency of the evidence against them with respect to the conspiracy to possess with intent to distribute. As to Cadena, like Smigowski of the land conspiracy, *see United States v. Rodriguez, supra,* there was no evidence that he knew of a distribution scheme when he conspired to import the marijuana. Unlike the situation presented by an ongoing enterprise, Cadena had no interest in or awareness of what plans, if any, had been reached to dispose of the marijuana once he reached these shores. Although a conspiracy to import facilitates a conspiracy to distribute, one cannot joint a conspiracy, whether by conduct or verbal accord, unless one knows that it has in fact been concocted. Although we have indicated that there was sufficient evidence from which it might be inferred that Rodriguez and Albernaz had joined distribution plans, from Cadena's perspective, it was not apparent that any accord had yet been reached, either tacitly or otherwise.

Because there was insufficient evidence to sustain Cadena's conviction on Count II, that count of the indictment must be dismissed with respect to him.

Accordingly, the judgment of the district court is REVERSED in part, AFFIRMED in part, and remanded for further proceedings consistent with this opinion.

SKELTON, Senior Judge, concurring in part and dissenting in part:

I concur in all of the majority opinion except that portion of part III wherein the

---

**31.** Our brother, dissenting in part, sees fit to recite, as if it were proved fact, the testimony of Cadena and one crew member offered by the defense. The jury did not see fit to credit this, and they were not obliged to. Our opinion is based on the sufficiency of the evidence offered by the government, construed, as we are required to construe it, most favorable to the government. *Glasser v. United States,* 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680.

**32.** Appellant Gilberto Yepes Borja was sentenced to concurrent terms of imprisonment of four years; appellant Cadena was sentenced to consecutive terms of imprisonment of three years; the remaining eleven appellants were sentenced to concurrent terms of imprisonment of two years. In addition, each appellant received a special parole term of two years on each count, to run concurrently except as to appellant Cadena.

convictions of the following members of the crew of the ship Labrador on Count I and Count II were affirmed: Pedro A. Ballesteros Esquebel, Gilberto Yepes Borjas, Cesar Dela Rosa, Narciso Barba Cadena, Daniel Garcia Gomez, Efrain Carreazo Cardales, Pedro Ruiz Arrieta, Jorge Lopez Wagner, Nicanor Rivera Diaz, Alajandro Valle Mantaress, Andres Gomez Ortega and Francisco M. Ceba Bruno.[1]

I cannot agree that the members of the crew were properly convicted on the charges in Counts I and II, because in my opinion, there was no evidence that they had knowledge of the conspiracy to import marijuana into the United States or the conspiracy to distribute it.

The first error made by the majority is to treat and consider the crew members and Cadena as if they were one and the same, and to hold the crew members accountable for everything that Cadena did. This was wrong, because there was a vast difference between them. Cadena, who was the captain and boss of the ship and its cargo, was clearly involved in the conspiracy to import marijuana into the United States and the majority properly so held. Whereas, the situation with respect to the crew was entirely different.

The crew members were nothing but laborers who were recruited in various places in Colombia, in South America, to do the manual labor on the ship Labrador in transporting coffee and other items from one country to another. On the first trip, the ship went to Panama and picked up televisions, radios, refrigerators and clothing, and transported them to the island of Aruba off the coast of South America. Thereafter, the ship proceeded to a desert area on the north coast of Colombia to a place called La Guajira where the people are very poor and make a living by illegal means such as dealing in contraband. They are called Guajiros, and they rule the area by the use of guns and without any respect for law and order. When the ship stopped in this area, a number of armed Guajiros boarded the ship and, after forcing the crew into a corner of the galley, proceeded to load the ship with bags and bales which they told the crew contained coffee. The Guajiros gave Cadena instructions where to take the cargo.

Had the crew known that the cargo was marijuana when it was put aboard, they could not have abandoned the ship even if they had wanted to because to have done so in that desolate area in the face of the armed Guajiros would have been suicidal.

After the ship left La Guajira, the crew discovered that the cargo was marijuana. At that time there was nothing they could do about it short of mutiny, and that is very dangerous on any ship and could hardly have been expected of these lowly seamen who had no interest or stake in the marijuana. The ship did not stop at any port during the voyage from La Guajira to the point on the high seas where it met the ship Catchalot II. Accordingly, the crew had no opportunity to leave the Labrador, but found themselves victims of circumstances over which they had no control. Upon meeting the Catchalot, Cadena ordered the crew to transfer a quantity of the marijuana to the Catchalot. Some, but not all, of the crew complied. They were assisted by the crew of the Catchalot. Thereafter, the United States Coast Guard arrived and arrested Cadena and the crew. All of this took place in international waters on the high seas more than 200 miles from the shores of the United States and outside its territorial waters.

Cadena and the crew were taken to Florida where they were charged, indicted, tried, and convicted of conspiracy to import marijuana, and conspiracy to distribute it, into and in the United States.

At the trial the crew was required to sit at all times in numbered seats in a group according to a chart. None of the prosecuting witnesses knew them except by reference to the chart. It is clear to me that

---

1. I do not consider Nino Rinsi Cadena to be a member of the crew. He was actually the captain of the ship. Accordingly, when reference is made to the Ship's "crew" or to the "crew members" he is not included. He will be referred to as Cadena.

1268

they were convicted as a group contrary to law and not as individuals as required by law and by the charge of the court. In this connection, the court charged the jury:

"The jury should give separate consideration, and render separate verdicts with respect to, each defendant, and as to each count. *Each defendant is entitled to have his guilt or innocence as to each of the crimes charged determined from his own conduct and from the evidence which applies to him as if he were being tried alone.* If the jury finds that a defendant is guilty beyond a reasonable doubt of any one of the crimes charged in the indictment, a verdict of guilty should be returned as to him. The guilt or innocence of any one defendant of any of the crimes charged should not influence the jury's verdicts respecting the other defendant(s). The jury may find any one or more of the defendants guilty or not guilty of the offenses with which they are charged." (Emphasis supplied.)

. . . . .

"However, in determining whether a particular defendant was a member of the conspiracy, if any, *you may consider only his own acts and statements. He cannot be bound by the acts or declarations of other participants unless and until it is established that a conspiracy existed, and that he was one of its members.*" (Emphasis supplied.)

. . . . .

"It is necessary, however, that the Government prove beyond a reasonable doubt that each defendant was aware of the common purpose, and was a willing participant, with the intent to advance the purpose of the conspiracy. On the other hand, *a person who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator.* Mere similarity of conduct among various persons, and the fact that they may have associated with each other, and may have assembled together and discussed common aims and interests does not necessarily establish proof of the existence of a conspiracy. *Mere knowledge that an offense is being committed, or even physical presence at the commission of a crime is not equivalent to participation in a conspiracy.*" (Emphasis supplied.)

It is obvious that the jury did not follow these instructions when they convicted the members of the crew. As shown by the charge, the prosecution was required to prove beyond a reasonable doubt that each member of the crew, acting *individually* and not as a member of the group, had knowledge of the conspiracies and willingly participated in them as shown by his own individual acts, statements and conduct. This the Government wholly failed to do. For instance, let us select one of the crew members at random, namely, Daniel Garcia Gomez, and see if there is any evidence that he had knowledge of the conspiracies and willingly and with intent participated in them. We search in vain through the record and find no such evidence. The same is true with respect to each of the other members of the crew. All that the Government proved was that the members of the crew were present on the ship and some of them transferred some of the marijuana from it to the Catchalot. Even though this furthered the object or purposes of the conspiracies, and even though the crew had knowledge an offense was being committed and they were present at the time and place, these facts, by the express provisions of the court's charge, are not equivalent to participation in the conspiracies if the crew had no knowledge of the conspiracies.

Furthermore, the crew was not bound by the acts and declarations of Cadena unless the crew members were members of the conspiracies, and the court so charged the jury, as shown above. Notwithstanding the charge of the court, it is clear that the jury convicted the crew members as a group and not as individuals because of the acts and conduct of Cadena, and because they were present on the ship when the marijuana was off-loaded. This is clearly insufficient to convict the crew of being co-conspirators in the two conspiracies.

This case is similar to and its disposition is controlled by *United States v. Falcone,*

311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940). In that case the defendants sold sugar, yeast and cans to whiskey distillers knowing that they were to be used in the illicit distilling of whiskey. They were indicted and convicted as co-conspirators along with the buyers who had conspired with others to distill spirits in violation of the revenue laws. The evidence did not show that the sellers had knowledge of the conspiracy of the distillers, and the Supreme Court reversed the convictions on the ground that without this knowledge the sellers could not be convicted as conspirators. In this connection the Court said:

"The gist of the offense of conspiracy as defined by § 37 of the Criminal Code, 18 USCA § 88, is agreement among the conspirators to commit an offense attended by an act of one or more of the conspirators to effect the object of the conspiracy. *Pettibone v. United States,* 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419; *Marino v. United States* (CCA 9th) 91 F.2d 691, 113 A.L.R. 975, supra; *Troutman v. United States* (CCA 10th) 100 F.2d 628; *Beland v. United States* (CCA 5th) 100 F.2d 289; cf. *Gebardi v. United States,* 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206, 84 A.L.R. 370, supra. *Those having no knowledge of the conspiracy are not conspirators, United States v. Hirsch,* 100 U.S. 33, 34, 25 L.Ed. 539, 540; *Weniger v. United States,* (CCA 9th) 47 F.2d 692, 693; *and one who without more furnishes supplies to an illicit distiller is not guilty of conspiracy even though his sale may have furthered the object of a conspiracy to which the distiller was a party but of which the supplier had no knowledge.*" (311 U.S. at 210, 61 S.Ct. at 207, 85 L.Ed. at 132) (Emphasis supplied.)

The facts in that case were much stronger against the defendants than those against the crew members here, because the defendants there knew that the products they were selling would be used for an illegal purpose, and, as owners, they had a stake in the sales because they received money for them. In our case the crew members did not own nor possess the marijuana, had no control over its disposition,

and were not to receive any money for its delivery or sale to anyone. The most that they could be accused of was having the knowledge that somewhere, somehow and someday the marijuana, because of its nature, might be or could be used for an illegal purpose by someone. But even if they had known this as a positive fact, that would not have been enough to convict them of conspiracy, as that was exactly the situation in the *Falcone* case. Furthermore, if the last paragraph of that opinion is paraphrased to fit our case it would read as follows:

"One [a crew member] who without more furnishes supplies [marijuana] to an illicit distiller [user or dealer] *is not guilty of conspiracy* even though his sale [furnishing] may have furthered the object of a conspiracy to which the distiller [user or dealer] was a party but of which the supplier [crew members] had no knowledge." (Emphasis supplied.)

Consequently, the operation of the ship by the crew members to transport the marijuana and its transfer by some of them from the Labrador to the Catchalot may have furthered the object of the conspiracies, but according to the court's charge and the decision in the *Falcone* case, since there was no evidence that the crew members had knowledge of the conspiracies, they could not be convicted of conspiracy.

The majority acknowledges that this is the law, but has failed to apply it to the crew members.

The majority attempts to distinguish this case from the *Falcone* case by saying that the crew members knew of the conspiracies because they "supplied an illegal substance" citing *Direct Sales Co. v. United States,* 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). No law of the United States has been cited, and none called to my attention, that makes marijuana found in a foreign ship on the high seas in international waters more than 200 miles from the shores of the United States and far beyond its territorial waters an "illegal substance." Furthermore, even if the marijuana was an illegal substance

under these circumstances, which I doubt, such fact would not prove, without more, that the crew members had knowledge of the conspiracies on which they were convicted.

It should be noted that in the *Direct Sales Co.* case the Supreme Court reaffirmed its holding in the *Falcone* case when it said:

> "That decision [*Falcone*] comes down merely to this, that one does not become a party to a conspiracy by aiding and abetting it, through sales of supplies or otherwise, unless he knows of the conspiracy; and the inference of such knowledge cannot be drawn merely from knowledge the buyer will use the goods illegally." (319 U.S. at 709, 63 S.Ct. at 1268, 87 L.Ed. at 1680).

. . . . .

> "*Without the knowledge, the intent cannot exist. United States v. Falcone,* 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128, supra. *Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal.* Ibid. This, because charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning what, in that case, was called a dragnet to draw in all substantive crimes." (319 U.S. at 711, 63 S.Ct. at 1269, 87 L.Ed. at 1681). (Emphasis supplied.)

The above quotations from the *Direct Sales Co.* decision show that the case is actually authority that supports the crew members in the instant case in that it reaffirms the holding of the Court in *Falcone* that one must have knowledge of a conspiracy before he can become a party to it and this knowledge cannot be supplied by inference drawn from the sale or furnishing of articles knowing they will be used illegally. The knowledge of the conspiracy must be established by evidence that is clear and

unequivocal and cannot be made out by piling inference on inference. By these standards, the crew members in the instant case clearly had no knowledge of the conspiracies involved here and could not be guilty of the charges on which they were convicted.[2]

I condemn the importation of marijuana into the United States and its distribution here as much or perhaps more than my brothers, especially in quantities such as are involved here, but I cannot allow my prejudice against this illicit traffic to cause me to approve the convictions of the crew members when there is no evidence that they had knowledge of the conspiracies or that they knowingly or willingly participated in them.

The majority holds that although Cadena is guilty as a co-conspirator to import marijuana into this country, the evidence is insufficient to sustain his conviction as a co-conspirator to distribute the marijuana, and orders his conviction under Count II reversed and Count II dismissed as to him. Paradoxically the majority affirms the convictions of the crew members on both counts when there is not a scintilla of evidence that members of the crew knew of the conspiracy to distribute marijuana or participated therein. This is unequal justice under the law and I cannot approve it. The majority says that they need not consider the sufficiency of the evidence against the crew members with respect to the conspiracy to possess with intent to distribute because they got concurrent sentences on both counts. This reasoning is insufficient in my opinion to justify the failure to consider and dispose of this issue, because the convictions of the crew members on Count II are nevertheless convictions that will go against their records, and as such may work hardships on them in the future. In any event, such convictions are wrong.

---

2. The Supreme Court distinguished the *Falcone* case from the *Direct Sales Co.* case on the facts by pointing out that in *Falcone* there was no conspiracy between the seller and the buyer as the conspiracy was between the buyer and others to make illegal whiskey of which conspiracy the seller had no knowledge. Whereas, in *Direct Sales Co.* the conspiracy existed between the seller and the buyer themselves and consequently the seller had knowledge of it. In any event, both cases hold that before a person can be convicted of conspiracy he must have knowledge on it. Therefore, the reliance of the majority on *Direct Sales Co.* is misplaced.

Finally, I would point out that the crew members were Latin American laborers who could neither read, write nor speak English. We can assume that because of this handicap they hardly knew what was going on during the trial. They have been in jail since February 3, 1977, which is a lot of punishment for them, especially when the record shows that the evidence was insufficient to sustain their convictions on either count.

I would reverse their convictions and order both counts dismissed as to them. I would affirm the remainder of the judgment of the district court as modified by the majority opinion.