588 F.2d 106
 UNITED STATES of America, Plaintiff-Appellant,
v.
Alberto CORTES, Humberto Medrano Gil, Catalino Mercado Polo,
Johon A. Martinez, Edelberto Escobar Campo, Armodio Q.
Olivo, Oscar Beltran Romero, Simon Bargas Perez, Martin
Julio Marimon, Alonso Medrano Molina, Florentino
Riascos-Riascos, and Luis Barrios Leon, Defendants-Appellees.
 No. 78-1734.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 16, 1979.
 
 J. V. Eskenazi, U. S. Atty., Miami, Fla., Mervyn Hamburg, Atty., Dept. of Justice, Washington, D. C., for plaintiff-appellant.
 John Steven Berk, Fort Lauderdale, Fla., Nathaniel L. Barone, Jr., Miami, Fla., Robert A. Spiegel, Coral Gables, Fla., for defendants-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before GEWIN, GEE and RUBIN, Circuit Judges.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 Vessels on the high seas are protected from unlawful search and seizure by the power of the sovereign whose flag they fly. International law and treaties extend to ships the same integrity they enjoy in the land of their registry save where the actions of those aboard create such a hazard to another state that subjection to the law of that state is warranted. By its very nature, however, the stateless vessel claims no sovereign. In this case we examine for the first time the legality of a Coast Guard search on the high seas of a vessel-without-a-country. We conclude that, under the authority granted by United States statutes and international law, the boarding and subsequent search of the vessel PITER was justified, and that the trial court erroneously dismissed the indictment of the defendants, who were arrested aboard the ship, and suppressed the evidence seized.
 
 I. FACTS
 
 2
 The PITER was first sighted by the Coast Guard in international waters south of the Dominican Republic on the evening of January 16, 1978. Noting that the vessel had no name permanently affixed to her hull and was flying no flag, the Coast Guard cutter ALERT approached her, and inquired her name, nationality, and home port. The vessel hoisted a British Honduran flag, and claimed to be from Belize, British Honduras. The ALERT thereupon ceased surveillance. Coast Guard operations center in Miami, to which the information was conveyed, subsequently ascertained that no such ship was registered in or had recently visited Belize.
 
 
 3
 On January 22, Customs patrol officers off the cost of Florida stopped a suspicious American vessel, the PRINCESS CHARLOTTE, escorted her to port, and searched her. They discovered 23,500 pounds of marijuana. The legality of these actions and the admissibility of the fruits of the search are not questioned.
 
 
 4
 Three days later, while on routine patrol on the high seas near Little Bahama Bank, the Coast Guard cutter CAPE SHOALWATER came upon the PITER lying at anchor far from land. Because the PITER was flying no flag and had no permanently-affixed name, the CAPE SHOALWATER came alongside her and inquired her nationality. One of the defendants answered that the vessel came from San Andres Island, a Colombian possession, and that the captain had gone ashore because of engine trouble. The nearest land was 26 miles away, so the justifiably suspicious commander of the CAPE SHOALWATER radioed Coast Guard operations center in Miami. He was directed to board the vessel to determine its nationality.
 
 
 5
 When the Coast Guard personnel boarded the PITER, the crew showed no registration papers; therefore, the Coast Guard undertook a search of the vessel to find a main beam number to aid in identifying her. They found no such number, but, as soon as they entered the main hold, detected the smell of marijuana. Thereupon they examined the boxes in the hold and found them to contain the controlled substance. They seized the vessel and removed it to Miami where it was searched more thoroughly. The second search uncovered various pieces of furniture and matchbooks belonging to the PRINCESS CHARLOTTE. At no time was the PITER ever determined to be registered and it must therefore be treated as a stateless vessel.
 
 
 6
 The defendants, all Colombian members of the PITER crew, as well as the two Americans previously arrested aboard the PRINCESS CHARLOTTE, were indicted for conspiracy to import marijuana, conspiracy to possess with intent to distribute, and completed substantive counts in violation of 21 U.S.C. §§ 841, 952, 960 and 963, and 18 U.S.C. § 2. Prior to trial, the Colombian defendants moved to dismiss the indictment for lack of subject matter jurisdiction, and to suppress the evidence seized following what they claimed to be an illegal search. The district court granted the motions. We reverse and remand for trial.
 
 II. SUBJECT MATTER JURISDICTION
 
 7
 Defense counsel conceded during oral argument that our recent decision in United States v. Cadena, 5 Cir. 1978, 585 F.2d 1252, forecloses any attack on the subject matter jurisdiction of the court over the offense charged. We must therefore reverse on this point.[1]
 
 III. LEGALITY OF THE SEARCH
 A. Authority of the Coast Guard
 
 8
 Under 14 U.S.C. § 89(a)[2] the Coast Guard is granted authority to search and seize any vessel on the high seas that is "subject to the jurisdiction, or to the operation of any law, of the United States." As we noted in Cadena, supra, the statute is not limited on its face to domestic vessels; we there concluded that jurisdiction over the offense conferred authority under § 89(a) to search and seize foreign vessels on the high seas.
 
 
 9
 In Cadena, there was clearly probable cause to believe United States law was being violated when the Coast Guard approached the vessel later searched. Here it is conceded that at the time the CAPE SHOALWATER approached the PITER it had no reason to suspect the vessel was engaged in illegal activities. The fortuitous subsequent discovery of misdeeds cannot itself confer the jurisdiction necessary to warrant the Coast Guard search.
 
 
 10
 There was ample reason to investigate to determine whether the PITER was registered, and, if so, its nationality; or, if it was stateless, to ascertain that fact and to take such action as its lack of vassalage might warrant. The actions of the Coast Guard were restricted to inquiries, boarding, and limited search designed to elicit information about the vessel's identity and registration. Under the principles of international law discussed below, stateless vessels are subject to this type of examination. Hence, stateless vessels are "subject to the jurisdiction . . . of the United States" for these limited purposes; we conclude therefore, that the Coast Guard had authority under § 89(a) for its actions.
 
 
 11
 This authority is not curtailed by the Convention on the High Seas, 450 U.N.T.S. 82, 13 U.S.T. 2312, T.I.A.S. No. 5200. The Convention recognizes certain principles of international law for the mutual benefit of its signatories. As a stateless vessel, the PITER was entitled to no protection under its provisions. Indeed, even had the vessel been registered in Colombia, the nationality of its crew, the Convention would have provided defendants no comfort because Colombia is not a party. As we stated in Cadena, supra, 585 F.2d 1252 at 1261, "There is no indication in the treaty, or elsewhere, that it was intended to confer rights on non-member nations or on vessels of non-member nations, let alone on citizens of non-member nations."
 
 
 12
 The defendants argue that, even if they cannot invoke the protection of the Convention, the treaty, or the international law it recognizes, operates to restrict the actions of signatory nations towards stateless vessels. The only mention of statelessness in the Convention is in Article 6 which provides in part:
 
 
 13
 2. A ship which sails under the flags of two or more States, using them according to convenience, may not claim any of the nationalities in question with respect to any other State, and may be assimilated to a ship without nationality.
 
 
 14
 Ships "without nationality" are afforded no special protection in any other provision of the treaty.
 
 
 15
 Defendants note, however, that Article 22[3] of the Convention deals with situations in which a warship, such as a Coast Guard cutter, may board and search a "foreign merchant ship" on the high seas, and claim the Coast Guard is limited by its provisions.
 
 
 16
 Even were we able to conclude that the provisions of the Convention may be invoked by citizens of a non-signatory nation to restrict the powers of a party to the treaty, Article 22 would not limit the Coast Guard's actions here. By its very terms, that section applies only to the boarding and search of "foreign merchant ships", and those ships are identified as vessels that have the "right to fly" the flag they show. The PITER was a stateless vessel, or, using the terminology of Article 6 of the Convention, a "ship without nationality". Stateless vessels are not entitled to the same protection afforded vessels registered in a foreign nation which is a signatory of the Convention.
 
 
 17
 Whatever protection may be afforded stateless vessels and their alien crews under local law, see our discussion of the Fourth Amendment, Infra, international law shelters only members of the international community of nations from unlawful boarding and searches on the high seas. As stated in I. Oppenheim, International Law 546 (7th ed. 1948):
 
 
 18
 In the interest of order on the open sea, a vessel not sailing under the maritime flag of a State enjoys no protection whatever, for the freedom of navigation on the open sea is freedom for such vessels only as sail under the flag of a State.
 
 
 19
 Thus in Molvan v. Attorney General for Palestine, 1948, A.C. 351, 369, the Privy Council stated that with regard to stateless vessels "(n)o question of comity nor of any breach of international law can arise, if there is no State under whose flag the vessel sails." See also I. Brownlie, Principles of Public International Law 212, 222 (1966); H. Meyers, The Nationality of Ships 309-323. (1967). To secure the protection accorded foreign merchant ships on the high seas, a vessel must accept the duties imposed by registration. This the PITER failed to do; her crew can not complain of the results.
 
 B. The Fourth Amendment
 
 20
 Authority to search and seize the vessel under American law or international standards does not establish that the Coast Guard actions were consistent with Fourth Amendment requirements. Cf. Almeida-Sanchez v. United States, 1973, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (United States Border Patrol). Once aliens become subject to liability under United States law, they also have the right to benefit from its protection. Cadena, supra,585 F.2d 1252 at 1262. We must therefore consider whether there was probable cause for the search that took place, combined with exigent circumstances excusing the failure to procure a warrant, or other special circumstances justifying the Coast Guard actions.
 
 
 21
 At the time the PITER was approached by the CAPE SHOALWATER, the Coast Guard cutter had nothing more than curiosity that a flagless, unnamed vessel should be riding at anchor at a point so far from land. Under a well-established rule of international law, known as the Right of Approach, the cutter had the authority to sail up to the unidentified vessel to ascertain her nationality. See, e. g., The Marianna Flora, 1826, 24 U.S. (11 Wheat.) 1, 43, 6 L.Ed. 405, 415; H. Meyers, Supra, at 82 n. 1; Colombos, The International Law of the Sea 270-71 (4th ed. 1959); H. Smith, The Law and Custom of the Sea 64-65 (1959).
 
 
 22
 After the CAPE SHOALWATER communicated with the Coast Guard operations center in Miami, it had justifiable suspicion that the PITER was attempting to conceal its identity and activities. Under these circumstances, the boarding of the vessel to search for registration papers or other identification was not unreasonable for Fourth Amendment purposes.
 
 
 23
 Only when the PITER crew failed to provide the boarding crew with satisfactory registration papers did the further action of a limited search for identification become reasonable. During the course of this search for documents or a main beam number, the marijuana was found in plain view, creating probable cause for the seizure of the vessel and the later search in which the challenged evidence was discovered. Although the vessel was anchored at the time of the Coast Guard actions, exigent circumstances were present in its inherent mobility, and the possibility that it would weigh anchor and flee. While we doubt that this congruence of factors will arise with any regularity in future cases, under the circumstances of this case, the search of the stateless vessel, PITER, was reasonable and cannot be assailed on Fourth Amendment grounds.
 
 
 24
 A fortiori, such a search does not invoke the exclusionary rule which is designed to assure the integrity of the actions of law enforcement officers, See, e. g., Mapp v. Ohio, 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081; Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, not to deprive the prosecution of evidence obtained during a search that took place in accordance with law.
 
 
 25
 For these reasons, the dismissal of the indictment and the grant of the motion to suppress are REVERSED and the case remanded for further proceedings in light of this opinion.
 
 
 
 [1]
 Although the briefs do not discuss the issue, the trial court also was in error when it concluded that personal jurisdiction over the defendants was lacking. As we stated in United States v. Winter, 5 Cir. 1975, 509 F.2d 975, 985-6, Cert. denied, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41:
 (U)nder well established case law of the Supreme Court and this Circuit, a defendant in a federal criminal trial whether citizen or alien, whether arrested within or beyond the territory of the United States may not successfully challenge the District Court's jurisdiction over his person on the grounds that his presence before the Court was unlawfully secured.
 See also United States v. Cadena, 5 Cir. 1978, 585 F.2d 1252 at 1259; United States v. Vicars, 5 Cir. 1972, 467 F.2d 452, 455-56, Cert. denied, 1973, 410 U.S. 967, 93 S.Ct. 1451, 35 L.Ed.2d 702.
 
 
 [2]
 14 U.S.C. § 89(a) provides in relevant part:
 The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested . . . ; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture . . . such vessel or such merchandise, or both, shall be seized.
 
 
 [3]
 Article 22 states in part:
 
 
 [1]
 Except where acts of interference derive from powers conferred by treaty, a warship which encounters a foreign merchant ship on the high seas is not justified in boarding her unless there is reasonable ground for suspecting:
 (a) That the ship is engaged in piracy; or
 (b) That the ship is engaged in the slave trade; or
 (c) That, though flying a foreign flag or refusing to show its flag, the ship is, in reality, of the same nationality as the warship.
 
 
 [2]
 In the cases provided for in sub-paragraphs (a), (b) and (c) above, the warship may proceed to verify the ship's right to fly its flag. To this end, it may send a boat under the command of an officer to the suspected ship. If suspicion remains after the documents have been checked, it may proceed to a further examination on board the ship, which must be carried out with all possible consideration