## UNITED STATES of America
### v.
**William Alford MAY MAY, Roger Cotera Cali, Abel Castellon Elles, Juan Cordoba Evangelista, Leonel Gaspar Angulo-Quinones.**

**Crim. Nos. B–78–501, H–79–38.**

United States District Court,
S. D. Texas,
Brownsville Division.

March 16, 1979.

J. A. "Tony" Canales, U. S. Dist. Atty., Houston, Tex., and Charles Lewis, Asst. U. S. Atty., Brownsville, Tex., Richard Cole, Lieutenant Commander, United States Coast Guard Legal Section, New Orleans, La., for the Government.

Rosen, Potela, Bronis & Angueira, P. A., Stephen J. Bronis, Miami, Fla., for defendants William Alford May May and Roger Cotera Cali.

Berk, Wagner & Montante, John Steven Berk, Fort Lauderdale, Fla., for defendants Juan Cordoba Evangelista and Leonel Gaspar Angulo Quinones.

Penzell & Diamond, P. A., Nathan P. Diamond, Coral Gables, Fla., for defendant Abel Castellon Elles.

## MEMORANDUM AND ORDER

GARZA, Chief Judge.

This criminal case originally involved 16 Defendants charged in a multi-count indictment with conspiracy to import marijuana, conspiracy to possess marijuana with intent to distribute, possession of marijuana with intent to distribute, conspiracy to use com-

munications facilities in facilitating the commission of a felony, and conspiracy to bring into and land in the United States certain aliens.[1]

On January 29, 1979, after extensive pre-trial hearings concerning a large number of motions covering a variety of issues, a jury trial against these 16 Defendants began. Only four counts remained in the case: Counts 3, 7, 8, and 9, involving possession of marijuana with intent to distribute, conspiracy to import marijuana, conspiracy to possess marijuana with intent to distribute, and conspiracy to use communications facilities in the commission of a felony. At the close of the Government's case-in-chief, the Court instructed the jury that it would have to return a verdict of not guilty as to Counts 3 and 9, leaving the jury to decide only the two counts involving conspiracy to import marijuana and conspiracy to possess marijuana with intent to distribute.

On February 6, 1979, the jury retired to deliberate. Later that same day, the jury returned verdicts of not guilty as to 11 of the Defendants: Ismael Yances De La Rosa, Carlos Plaza Vineras, Emilio Camargo Torres, Luis Nereo Lozano Balanta, Fabian Diaz Rivera, Daniel Pacheco Molina, Tomas Cavorcas Camacho, Rafael Figueroa Mosquera, Luis Miguel Padilla Bello, Delfino Alfaro Gulfo, and Eustorgio Cota Hernandez. As for the remaining five Defendants—William Alford May May, Roger Cotera Cali, Abel Castellon Elles, Juan Cordoba Evangelista, and Leonel Gaspar Angulo Quinones—the jury was unable to reach a verdict; on February 7, 1979, a mistrial was declared as to these five Defendants. The case was then re-set for jury selection on March 15, 1979.

On February 20, 1979, the five remaining Defendants filed a Motion to Transfer Cause for Trial. Due to the considerable amount of local publicity surrounding this case, and for the convenience of counsel in terms of transportation, this motion was granted, and the case is being transferred to the Honorable Woodrow Seals for trial in the Houston Division of the Southern District of Texas. Before fully transferring this case to Judge Seals, however, this Court intends through this Memorandum and Order to explain its rulings on the two most important series of motions filed by the Defendants in this case, the Motions to Suppress and the Motions to Dismiss based upon lack of jurisdiction.

The factual basis for this Court's denial of the Motions to Suppress and the Motions to Dismiss was developed by a final pre-trial hearing conducted in two sessions; one session was held on November 17, 1978, and the other on January 17, 1979. Testimony was heard from the following witnesses: Commander John Curtis Ikens, Commander Gary F. Crosby, Petty Officer Arturo Lopez, Ensign Michael David Farrel and Customs Patrol Officer Willie Canant.[2] Based upon the testimony elicited from these witnesses and the items of evidence introduced at the final pre-trial hearing, this Court makes the following findings of fact:

Commander Ikens is the Chief of the Intelligence and Law Enforcement Branch of the United States Coast Guard's 7th District, headquartered in Miami, Florida. Commander Ikens is very familiar with the techniques and modes of operations employed by those engaged in smuggling drugs from the nation of Colombia into the United States. Between January and November of 1978, Commander Ikens was aware of 94 vessels that were seized while transporting some 2.5 million pounds of marijuana. According to the best intelligence estimates, this is only 10 to 15 per cent of all the marijuana coming into the United States.

---

1. The crimes alleged in the indictment constituted purported violations of the following statutes: 21 U.S.C. §§ 841(a)(1), 843(b), 846, 952(a) and 963; 18 U.S.C. § 371; and 8 U.S.C. § 1324(a)(1).

2. The Court wishes to note for the record that the demeanor of all of these witnesses during the giving of their testimony was such that any fact-finder would be compelled to afford their testimony great weight. This is particularly true with regard to Commander Crosby and Ensign Farrel. Both of these officers made eminently credible witnesses; their testimony was direct, specific, unevasive and articulately persuasive.

From a number of intelligence sources, Commander Ikens is able to identify the Guajira Peninsula, located on the northern tip of Colombia, as a primary shipping point from which marijuana is shipped into the United States. In addition, due to events occurring during the last five years, Commander Ikens has also become familiar with what can be referred to as the "mothership" technique of smuggling marijuana into this country. A mother ship is usually a 70 to 90 foot, non-U.S. flag vessel found hovering off the coast of the United States and carrying large quantities of marijuana. The cargo of contraband is usually off-loaded into smaller vessels, which vessels leave from the United States coast to rendezvous with the mother ship outside of the territorial waters of the United States. Mother ships are generally vessels which were originally designed for fishing or short-run merchant trading; they are usually older ships, and carrying an unusually high number of crew members in order to assist in the loading and unloading of the mother ship's large, bulky cargoes of illegal merchandise. The rendezvous points can vary from 20 to 200 miles from the American coast, and the great distances traveled by the mother ships (their voyages commonly originate in Colombia) result in the necessity of their carrying extra fuel, which fuel is often found in oil drums on top of the decks of the vessels. These mother ships often fly false flags, the most typical being the flags of Panama, Venezuela or Honduras. When such vessels are seized, their crews often tell a standard story about how the master of the vessel just recently left the vessel in a small boat in the middle of the ocean.

Since 1973, most of the seizures of mother ships have occurred off the Atlantic and Gulf Coasts of Florida. Recently, however, because of law enforcement efforts in those areas, the smugglers have increasingly shifted their operations to the Gulf of Mexico and the coastal area off New England.

When a Coast Guard vessel is on patrol and encounters another vessel, it is standard operating procedure for the patrol vessel to attempt to determine the nationality of the encountered ship. Indeed, it is a common practice in the military to identify all surface traffic in the patrol area by name, home port and nationality. If the vessel is not properly identified, the Coast Guard vessel will check with the country of the flag being flown by the ship being investigated to determine if the ship is in fact registered to that country. If the ship is flying the proper flag and there is no indication or reasonable suspicion of illegal activity, then the ship is passed on. If, however, there is evidence of illegal activity, especially of illegal drug activity, the information is passed along by the patrol vessel through the chain of command to the country of the ship being investigated, and a request is made for permission to take action as agent of that country. If the ship is not flying the correct flag, the Coast Guard will continue an investigation to identify the ship, which investigation will consist of boarding the ship to check its documentation. Under applicable international law, vessels on the high seas demonstrate their nationality by the flag they fly and the documents issued by the country whose flag is being flown. In addition, all vessels have a beam number permanently affixed to or marked into the main beam of the vessel. This beam number is similar to an automobile's vehicle identification number, and is usually kept by the flag country of the vessel. The beam number is also noted on the vessel's documents; if no documents are available, other sources, such as Lloyds of London, can be contacted in an attempt to identify the country to which the vessel is registered. Under Coast Guard policy, the boarding personnel generally should first check the pilothouse and the captain's cabin for the ship's documents; both of these places are usually located above the decks. In those situations where a ship suspected of being involved in illegal activity is flying the proper flag, it has been the Coast Guard's experience that the country whose flag is being flown will usually grant permission to the Coast Guard to board and investigate the vessel. Panama, for example, has always granted its permission, while Colombia is the only nation which has denied permission to board.

The Coast Guard maintains and periodically updates a list of vessels suspected to be involved in illegal activities. This list is provided to Coast Guard vessels on patrol. At the time of the seizure involved in this case, neither the name SUPERFLY II nor JOHNETTE WALKER was on this list. However, it is a fact that the names of vessels involved in transporting narcotics are routinely and frequently changed. It is also a fact that vessels can legitimately carry the flags of various countries, flying them as a courtesy when they enter the ports or territorial waters of those nations. However, such flags are usually flown from yardarms, not from the main mast.

The following factors are looked to by Coast Guard patrol vessels in determining whether an encountered vessel should be considered suspicious: improper markings, no permanently attached name or home port; failure to fly a flag; failure to identify itself; the condition of the vessel; and unusual activities aboard the vessel.

Commander Gary F. Crosby is a Coast Guard Officer with over 18 years experience, and is the Commanding Officer of the Coast Guard Cutter DURABLE. The DURABLE is a relatively well-armed warship some 210 feet long; while on patrol, it usually carries with it a Sikorsky H–52 helicopter.

▆ Early in the month of August, 1978, a man approached the DURABLE's 24-hour watch stand and asked to see the officer of the day (OOD). Lieutenant David Beard was the OOD, and he met with the man shortly after 2:30 a. m. This man informed Lieutenant Beard that sometime later in the month of August, three shrimp boats were going to rendezvous with a ship off the United States coast to take marijuana off the ship and into the United States. Two of the shrimp boats were allegedly operating out of Freeport, Texas, while the other one was purportedly operating out of Corpus Christi, Texas. The informer said that 30 to 50 tons of marijuana would be aboard the main ship; however, the informer did not supply the name or type of this main ship and gave no indication of whether or not it was an American vessel. Commander Crosby knew that the man was asked what his name was, but could not remember whether a name was given. The Commander did know that the man gave a hotel as his address, and that Customs Patrol Officers tried unsuccessfully to contact the man there later. No other contact was had with this tipster, either before or since that one meeting with Lieutenant Beard. The information[3] given by the man was reported to the DURABLE's district office and to the Brownsville Customs office.

Later in the month of August, the DURABLE left port on a regularly scheduled patrol. On August 15, 1978, the DURABLE's helicopter was engaged in airborne reconnaissance when it reported sighting a vessel some 10 miles northeast of the DURABLE heading on a northwesterly course. The vessel was between 100 and 120 feet long with a blue hull and white superstructure. The vessel was not flying any flag, nor was there any indication of its hailing port. The name SUPERFLY II was painted on white boards attached to the vessel in some temporary manner. The blue paint on the stern appeared to be fresh, while the

---

**3.** Absolutely no weight can be given by this Court to the tip given to Lieutenant Beard prior to the DURABLE's departure on a regularly scheduled patrol. There is simply no indication as to the tipster's reliability or the source of his information. The tip was nearly devoid of specifics, making independent corroboration of the tip impossible. No information whatsoever was given as to the name, nationality, type or specific position of the vessel with which the shrimp boats were allegedly to meet and offload. The tipster's information adds nothing of substance to the events involved in the stop and seizure of the SUPERFLY II. Under the standards mandated by *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) and their progeny, this Court cannot give any weight to the tip in determining whether probable cause existed in the instant case. This Court adheres to those standards, and in no way relies on the tip in upholding the stop, search and seizure involved in this case. However, it is not unreasonable to draw the inference that this tip would heighten the suspicions of the crew of the DURABLE upon meeting any unidentified vessel in the general area referred to by the tipster.

paint on the sides appeared older, indicating the possibility that the hailing port had been painted over. The vessel also had both whip and long-wire antennas. Finally, the helicopter could see nine men aboard the vessel.

The helicopter, having made and reported the above observations, returned to the DURABLE. The DURABLE, having made radar contact with the SUPERFLY II, closed in on the ship until it made visual contact.[4] The DURABLE came astern the SUPERFLY II, keeping between 100 to 300 feet away from the other vessel. By using high-powered binoculars, Commander Crosby observed that there was no hailing port painted on the vessel, that the name SUPERFLY II was simply painted on a white board, that a white life ring on the port side had the name M/V JOHNETTE WALKER painted on it, that there were extra fuel drums on the deck, that the hull shape of the vessel was of a type commonly built in the United States, and that no flag was flying. At the first sighting, Commander Crosby could see no one on deck, but knew that a normal commercial vessel of the size of the SUPERFLY II would not have nine crewmen aboard. Since the helicopter had indicated that at least nine people were aboard the SUPERFLY II, it was clear to Commander Crosby that the vessel was overmanned.

Commander Crosby attempted to communicate with the SUPERFLY II by both radio and signal flags, but received no response. He next ordered the use of a battery powered megaphone, but it was difficult to discern what, if any, response was being made by those aboard the SUPERFLY II. Approximately 30 minutes later, Commander Crosby dispatched a small, 26-foot boat to a position alongside the SUPERFLY II. The officer in charge of the small boat was instructed to ask specific questions aimed at determining the SUPERFLY II's nationality, and was told *not* to indicate that the SUPERFLY II should stop. At this point, the SUPERFLY II was neither stopped nor boarded.

Just prior to the small boat's being lowered away from the DURABLE, the SUPERFLY II raised a Panamanian flag. This flag appeared to be a new one; it had fold marks as if just taken out of a protective plastic bag and was neither tattered nor stained.

In response to questions asked from the small boat (which questions were asked in both English and Spanish), a spokesman for the crew stated that they were Panamanians who had begun their voyage from Honduras and were heading for Tampico, Mexico. (At this point the SUPERFLY II was many miles northeast of Tampico and heading on a course directed toward the northwest that would take it even further from Tampico in a northerly direction.) The crew's spokesman appeared to be the Defendant William May May.

Upon receiving this information, Commander Crosby, via radio communications, requested that his superiors initiate the process [5] whereby the claimed nationality of the SUPERFLY II could be either confirmed or denied. If the SUPERFLY II was indeed a Panamanian vessel, Commander Crosby also sought permission to board the ship as an agent of the Panamanian government; if it was not verified as a Panamanian vessel, then Commander Crosby wanted a "no objection to boarding" statement from his superiors. The Commander's suspicions about the SUPERFLY II had been aroused by a number of factors, including the hand-lettered, non-permanent name-board on the vessel, the failure to have a home port noted on the stern, the

---

4. On Government Exhibit No. 5 there is a red line which indicates the track line of the DURABLE and the SUPERFLY II. The southernmost point of this red line indicates the position where the DURABLE first came astern of the SUPERFLY II. The point where the DURABLE's helicopter first sighted the SUPERFLY II is indicated by a small red dot circled in red.

5. This process consists of passing the information through the Coast Guard's chain of command to its headquarters in Washington, D. C. There the information is passed to the Coast Guard's State Department liaison, and the State Department checks with the country whose flag is being flown by the vessel in question.

presence of oil drums on the deck, and the unusually large number of crewmen aboard the vessel. In Commander Crosby's experienced view, the SUPERFLY II fit the classic mother ship pattern, and it crossed his mind that the vessel might be carrying a load of marijuana.

Immediately after the small boat returned to the DURABLE, the SUPERFLY II made nearly a complete 360-degree turn, in 20-degree increments to the right, over a short span of time. The heading of of the SUPERFLY II before this turning maneuver was 310 degrees true; upon its completion, the heading was 300 degrees true. The DURABLE followed the SUPERFLY II throughout this maneuver. Commander Crosby had seen similar maneuvers before on the part of boats seeking to discover if a patrolling vessel intends to follow the maneuvering vessel; therefore, the maneuver further aroused his suspicions concerning the SUPERFLY II.

August 15 is a national holiday in Panama, and the DURABLE received no information from that country during that day. The DURABLE did, however, continue to follow the SUPERFLY II while awaiting the requested information; in no way did it impede or prevent the SUPERFLY II from proceeding wherever it wished to go. At approximately 3 o'clock a. m. on August 16, 1978, the SUPERFLY II made an abrupt change in course, forcing the DURABLE to make an equally abrupt course change and increase in speed in order to avoid a collision.[6] The DURABLE came around and continued to follow the SUPERFLY II.[7]

At 9 o'clock a. m. that same morning, the SUPERFLY II again changed course and headed toward the DURABLE; this time, however, it stopped with its engines idling and attempted to hail the DURABLE. Because of the difficulty in hearing what was being said by those aboard the SUPERFLY II, Commander Crosby once again ordered the lowering of the small boat and dispatched it to the SUPERFLY II. Among those in the small boat was Petty Officer Arturo Lopez, who directed the questions in Spanish to the crew of the SUPERFLY II. In response to specific questions, those aboard the ship indicated that they were lost and needed assistance, that they were headed for Tampico, Mexico, that they did not know about any charts on board and that they did not know how much fuel they had. In addition, the crewmen stated that on the morning of August 15, at approximately 6 o'clock a. m. (prior to the DURABLE's initial encounter with the SUPERFLY II), the master of the SUPERFLY II had left the ship on a raft with a small motor.[8] Before leaving, the master had allegedly told them to continue on a heading of 310 degrees true, and that this course would get them to Tampico, Mexico.

Since Commander Crosby had not yet heard from his chain of command, he refrained from boarding the SUPERFLY II at this time. Both vessels simply drifted in the water, from approximately 9:15 a. m. to 7:34 p. m. of August 16, 1978. Early that afternoon, the DURABLE received word through the chain of command that the SUPERFLY II was not a legitimate registered vessel of Panama. Later that evening, after consultations in Washington, D. C., among the Coast Guard, the State De-

6. The DURABLE has a top speed of 17 knots, while the SUPERFLY II at the time of this turn-around was traveling at the speed of 6 knots. In addition, the DURABLE was much larger than the SUPERFLY II and, of course, was well-armed. Commander Crosby did not feel that the SUPERFLY II was attempting to ram the DURABLE by this maneuver, and the subsequent boarding of the SUPERFLY II was not accomplished out of any belief that it was a hostile ship.

7. The location of this turn-around is indicated on Government's Exhibit No. 5 by the north-

ernmost red-circled dot on the solid red line. When this change in course occurred, the SUPERFLY II was approximately 105 miles from the Texas coast. When first sighted, the SUPERFLY II was some 220 miles from the Texas coast; therefore, it had proceeded approximately 115 miles on a course taking it directly toward the United States and away from its stated destination.

8. Commander Crosby had heard similar stories before. No raft was ever sighted by either the DURABLE or its helicopter.

partment and the Department of Justice, the Coast Guard Commandant issued a "no objection to boarding" statement, which statement was passed on to the DURABLE through the district office. It was only then that Commander Crosby gave the order to board the SUPERFLY II; in so doing, he specifically limited the purpose of the boarding to a determination of the ship's true nationality. Although Commander Crosby had reason to suspect that the SUPERFLY II was carrying marijuana, his orders to the officer in charge of the boarding party,[9] Ensign Michael Farrel,[10] were limited solely to doing those things necessary to determine the SUPERFLY II's true nationality. Ensign Farrel was ordered to examine the vessel's documents; if none were on board, then he was to locate the beam number.[11] The boarding took place at a point approximately 135 miles from the coast of the United States.

Two boats were used to transport the boarding party to the SUPERFLY II. These two boats carried between 20 and 25 men, but only eight men actually boarded the SUPERFLY II.[12] As the boarding party approached, Ensign Farrel, after identifying himself, ordered the SUPERFLY II's crew to assemble at the forward end of their ship. As he boarded the right-hand side of the SUPERFLY II's stern, Ensign Farrel could smell the odor of marijuana.[13]

After boarding the SUPERFLY II, Ensign Farrel went forward to where the crew was and again identified himself to them. He then asked about the ship's documents; the response from the crew was that they knew nothing about any documents.[14] Ensign Farrel had faced similar situations in the past (i. e., where crew members of a vessel disclaimed any knowledge about that ship's documents), and had not found any documents.[15] While such documents are normally kept in the bridge/navigation area, the captain's cabin or the crew's quarters, they can be anywhere aboard a vessel. In light of his knowledge and his previous experiences, Ensign Farrel decided he would first locate the main beam number. Without asking any crew member's permission to do so, he and two other members of the boarding party proceeded to the main hold with the intention of entering it to

9. The members of the boarding party were Ensign Farrel, Ensign Creech, Lieutenant Rzemienski, Petty Officer Lopez, Petty Officer French, Senior Quartermaster Piffer, Customs Patrol Officer Homer and Customs Patrol Officer Canant. The boarding party carried two shotguns and an unspecified number of .45 caliber sidearms.

10. Ensign Farrel is a seven-year veteran of the Coast Guard and a graduate of the Coast Guard Academy. Ensign Farrel had been involved in several boardings prior to his leading the boarding party aboard the SUPERFLY II.

11. The nationality of a vessel can be determined by an examination of the documentation and the vessel's main beam number. The ship's documents should have the beam number of the ship recorded on them; once the documents are examined, the beam number on the vessel is located and checked against the number on the documents. If there are no documents, the beam number can be located and then used to discover to which nation the ship is registered. As previously noted, the beam number of a vessel is permanently affixed, through welding or carving, to the main beam of the vessel. The main beam is like a spike, running from the front to the back of the vessel below the deck and above the holds. To discover a ship's beam number, one must go into the holds of the ship.

12. As previously noted, the boarding party was armed with shotguns and sidearms; it was later determined that none of the crew members aboard the SUPERFLY II were armed.

13. Ensign Farrel has had previous olfactory experience with marijuana, having smelled multiton quantities seized from other mother ships. The strong odor of marijuana detected by Ensign Farrel was also testified to by Petty Officer Lopez, another member of the boarding party.

14. Normally the captain is not the only one aboard a vessel who knows the whereabouts of the ship's documents; the first mate and the navigator would also be aware of their location. Other crew members might also know where such documents were kept.

15. A later search of the SUPERFLY II failed to reveal any documents normally carried by vessels for the purposes of identification. Thus, Ensign Farrel's prior experiences with regard to crew members' disclaimers concerning ship documents proved to be valid predictors of what would occur aboard the SUPERFLY II.

find the beam number.[16] However, upon attempting to enter the hold, Ensign Farrel discovered that, except for some rags and a few pieces of wood, the hold was filled to the top with bales of marijuana.[17] On the basis of this discovery, the SUPERFLY II was seized and its crew members placed under arrest.[18]

After the boarding and seizure of the SUPERFLY II were completed, Commander Crosby received orders from the district office to place a custody crew aboard the SUPERFLY II with instructions to sail it toward the United States. The purpose of this was to attempt a controlled delivery, to try and draw out those who would be waiting for the SUPERFLY II's valuable cargo. Since mother ships do not anchor off the coast but instead either move back and forth on a line off the coast or around a specific geographic area, the custody crew was told to proceed to a point approximately 40 to 50 miles off the Texas coast in the manner of a mother ship.

During this attempt at a controlled delivery, no actual contact was made between the SUPERFLY II and any other vessel; however, several vessels did appear to be approaching the ship at one time or another. None of these vessels came closer to the SUPERFLY II than one-half mile, and only one of them, the F/V NUEVO,[19] could be identified by name. One of these vessels at one time made an abrupt course change toward the SUPERFLY II and then away from it, dropping fishing nets after turning away. In addition, while the SUPERFLY II was some 45 miles from the Texas coast, the DURABLE observed an airplane's navigational lights circling above the SUPERFLY II; at this point the DURABLE was some 10 to 12 miles seaward of the SUPERFLY.[20]

In addition to the multi-ton cargo of marijuana, a number of charts were found aboard the SUPERFLY II. One of them was Government Exhibit No. 8, which had marked on it a small x southeast of Mata-

**16.** The pilothouse aboard the SUPERFLY II was located directly behind the area where the crew had been mustered by the boarding party from the DURABLE. It would have taken approximately 15 minutes to make a quick check of the pilothouse. Ensign Farrel did not, to the best of his recollection, direct anyone to search the captain's cabin or the pilothouse. However, knowing that the documents could be located anywhere aboard the ship, and knowing that the beam number is normally easily discoverable, Ensign Farrel estimated that it could take hours to locate any documents, while only 10 minutes would be necessary to find the beam number. In light of this, Ensign Farrel's decision to locate the vessel's main beam number before searching for documents was eminently reasonable.

**17.** It was later determined that the SUPERFLY II was carrying some 32 tons of marijuana.

**18.** It is clear from the record that, prior to going to the hold, Ensign Farrel believed that there was a possibility that marijuana would be found aboard the SUPERFLY II. The SUPERFLY II did fit the profile of vessels used in smuggling contraband, and Ensign Farrel had discussed his suspicions about the SUPERFLY II's cargo with Commander Crosby prior to the boarding. Ensign Farrel also admitted that he was curious about what was in the hold of the SUPERFLY II, especially after smelling the strong odor of marijuana just before boarding. However, it is clear that Ensign Farrel had

instructions to determine the nationality of the boarded vessel, not to investigate the cargo. No matter what his suspicions and expectations were, and no matter how aroused his curiosity was, the fact remains that Ensign Farrel's actions upon boarding the SUPERFLY II were designed to carry out Commander Crosby's express orders. The decision to try to enter the main hold was neither unreasonable nor improper, given the circumstances and the previous experiences of Ensign Farrel.

**19.** The F/V NUEVO was boarded by Coast Guard personnel the day they left the area; no evidence of unlawful activity was discovered.

**20.** It takes no uncommon amount of common sense to perceive the reason for the DURABLE's failure at controlled delivery. Given the unpleasant results detection and apprehension would have on 'those involved in effectuating the safe delivery of the SUPERFLY II's illicit cargo to American markets, one does not have to stretch his imagination very far to realize that some type of signal would be employed between the SUPERFLY II and those desiring to off-load her merchandise to indicate all is well. Since the Coast Guard custody crew aboard the SUPERFLY II did not know and could not give the signal, those who were to approach her undoubtedly decided discretion was the better part of profit.

gorda Bay, Texas, along a pencil line running in an easterly direction from Port Aransas, Texas. Another pencil mark on this chart was located on top of a depth number located south of 27 degrees 30 minutes latitude and just north of 27 degrees 20 minutes latitude.

Another chart found aboard the SUPERFLY II was introduced into evidence as Government Exhibit No. 9. This chart had a portion of the upper left-hand corner torn completely off and a number of pencil markings that appear to converge upon the missing portion of the map. In Commander Crosby's experienced opinion, some of the lines looked like course lines laid down on navigational charts. In addition to these lines, there were lines running generally north-south off the Yucatan Peninsula with times marked along them, an indication that they were used as lines of position.[21]

A third chart found aboard the SUPERFLY II was marked and admitted into evidence as Government Exhibit No. 10. This map was a pilot chart, a type of chart used for maritime information. On this map, there are a number of small pencil marks appearing off the coast of Texas, with one of the marks consisting of a small, circled x.

Government Exhibit No. 5, in addition to plotting the actual positions of the DURABLE and the SUPERFLY II during their movements together, had marked on it various points and lines transposed from Government Exhibits 8, 9 and 10.[22] It is interesting to note that a 310 degree heading extended from the point where the SUPERFLY II was first located goes straight to the circled x found on Government Exhibit No. 10 and transferred to Government Exhibit No. 5; if the course followed by the SUPERFLY II after its nearly complete 360 degree turn was extended, it would run a little west of that point. In addition, all of the points and lines transposed from the other charts onto Government Exhibit No. 5 seem to converge upon the same general area off the coast of Texas. Finally, it is clear that if the SUPERFLY II had in fact kept to its 310 degree heading, it would have been impossible for it to have gotten to its avowed destination of Tampico, Mexico.

Based upon the above findings of fact, and based further upon a careful review of the applicable law, it is the opinion of this Court that the Motions to Suppress and the Motions to Dismiss based upon alleged lack of jurisdiction should all be denied.

## I. THE MOTIONS TO DISMISS

■ · The cutting edge of the Defendants' Motions to Dismiss is the claim that since the Defendants never entered into or had any contact with the United States or its territorial waters, and since all of the events involved in the case at bar took place in international waters and had no actual effect within the United States, this Court lacks jurisdiction over the offenses charged in the instant case.[23] As a result of recent opinions handed down by the Fifth Circuit Court of Appeals, this cutting edge has been dulled to the point of uselessness.

---

**21.** Lines of position are lines drawn on charts, which lines are observed by some navigational means. They are determined by using the sun, a sextant and sight reduction tables. Track lines, on the other hand, are lines laid down by a navigator to show where he wants to go.

**22.** Only the track lines were transposed from Government Exhibit No. 9 to Government Exhibit No. 5; the lines of position were not transferred.

**23.** The jurisdictional challenge in the instant case is directed solely to the subject matter involved and not to jurisdiction over the persons of the Defendants. It is well established

that any defendant in a federal criminal trial, whether a citizen or not, whether arrested in this country or not, may not successfully challenge a district court's jurisdiction over his person on the grounds that his presence before the court was unlawfully obtained. *United States v. Winter*, 509 F.2d 975, 985–86 (5th Cir. 1975), *cert. denied* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); *see United States v. Cadena*, 585 F.2d 1252, 1259 (5th Cir. 1978), *amplified per curiam* 588 F.2d 100 (5th Cir. 1979), and *United States v. Vicars*, 467 F.2d 452, 455–56 (5th Cir. 1972), *cert. denied* 410 U.S. 967, 93 S.Ct. 1451, 35 L.Ed.2d 702 (1973).

To begin with, under the provisions of 21 U.S.C. §§ 846 and 963,[24] there is no express requirement that the Government must either allege or prove an overt act, and it is settled law within this Circuit that it is unnecessary for the Government to prove an overt act in order to secure a conviction under those statutes. *See United States v. Rodriguez,* 585 F.2d 1234, 1245 (5th Cir. 1978); *United States v. Johnson,* 575 F.2d 1347, 1366 (5th Cir. 1978); *United States v. Littrell,* 574 F.2d 828, 832 (5th Cir. 1978); *United States v. White,* 569 F.2d 263, 266 (5th Cir. 1978); and *United States v. Thomas,* 567 F.2d 638, 641 (5th Cir. 1978). In addition, it has been established that the concept of extraterritorial application is implicitly contained within the above two statutes. *See United States v. Postal,* 589 F.2d 862, 885 (5th Cir. 1979).

In *United States v. Cadena,* 585 F.2d 1252 (5th Cir. 1978), *amplified per curiam* 588 F.2d 100 (5th Cir. 1979), it was noted that the fact that a vessel was outside this country's territorial waters does not mean that it is beyond the jurisdictional reach of the United States or the operation of American law. *Id.,* at 1257. In both *Cadena* and *United States v. Winter,* 509 F.2d 975 (5th Cir. 1975), *cert. denied* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975), the appellate court sustained jurisdiction over conspiracies involving nonresident aliens who were arrested on the high seas and had never entered the territorial limits of the United States, but who had participated in importation conspiracies by serving as crew members aboard the importing vessel. Of course, in both *Cadena* and *Winter,* there was proof of overt acts committed within the United States by at least one co-conspirator; in the instant case the Government offered no such proof during the final pre-trial hearing. Therefore, if *Cadena* had been the last word on the issue, the Defendants may have had a sharper tool with which to try to cut themselves loose from the jurisdiction of this Court. However, in *United States v. Williams,* 589 F.2d 210 (5th Cir. 1979), the Fifth Circuit expressly held that "proof of an overt act within the judicial district is not a prerequisite for district court jurisdiction" in cases involving 21 U.S.C. § 963. *Id.,* at 213.[25] Based upon the holdings of *Williams* and its immediate predecessors, it seems clear to this Court that the fact that all of the events in a particular conspiracy may have occurred outside the territorial limits of the United States is irrelevant to the question of a court's jurisdiction; if the Government can demonstrate that the extraterritorial acts of Defendants charged with conspiracy to import a controlled substance and/or conspiracy to possess a controlled substance with intent to distribute were *intended* to have an impact within the United States, then those Defendants are subject to the jurisdiction of the federal courts. Therefore, in cases involving charges such as those that went to the jury in the instant case, the Government does *not* have to prove any overt act within the United States; under 21 U.S.C. §§ 846 and 963, *intended impact* within this country is sufficient for jurisdictional purposes. This

---

24. 21 U.S.C. § 846 provides that: "[a]ny person who attempts or conspires to commit any offense defined in this subchapter [Subchapter I—Control And Enforcement] is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

21 U.S.C. § 963 declares that: "[a]ny person who attempts or conspires to commit any offense defined in this subchapter [Subchapter II—Import And Export] is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

25. In *United States v. Postal, supra,* at 886, n. 39, the Court declared that its statement in the body of the opinion concerning proof of an overt act committed within the United States was not meant to imply that proof of such an act was a necessary condition to the application of 21 U.S.C. § 963. The Court went on to say that *since proof of an overt act was not an essential element under § 963,* it could be concluded that proof of an overt act within the United States is no longer required for jurisdictional purposes, and that proof of intended territorial effects is sufficient. Although decided some nine days after *Williams, supra,* the panel deciding *Postal* apparently overlooked *Williams,* which in fact makes express the conclusion suggested by *Postal.*

holding fully comports with the somewhat expansive viewpoint of jurisdiction adopted by the Fifth Circuit in cases involving drug conspiracies. That viewpoint is an eminently reasonable one, fully justified by the scope of the smuggling problem and the various methods employed by those engaged in illicitly bringing controlled substances into this country. To require more would, in the words of the *Williams* court, result in the "anomalous requirement that more be shown for jurisdiction than is necessary for conviction of the crime," *Williams, supra,* at 213, and would force the federal courts of this nation to blind themselves to the realities of criminal operations; this Court refuses to be so blinded.

■ In the instant case, the evidence produced by the Government at the final pretrial hearing more than amply supports the conclusion that the illegal cargo found aboard the SUPERFLY II was headed for this country. When one considers the behavior of the SUPERFLY II after the DURABLE made contact with it, its actual position and heading as compared to its stated destination, the charts discovered aboard the vessel, the reasonable extrapolation of the lines noted on those charts, and the economic realities surrounding Mexican and Colombian marijuana supplies, it is obvious that the marijuana seized from the SUPERFLY II was intended for American markets and American markets alone. Since the Government has successfully demonstrated that the intended impact of the acts of those aboard the SUPERFLY II was within the United States, this Court has jurisdiction over the offenses charged, and all of the Motions to Dismiss based upon lack of jurisdiction will be denied.

## II. THE MOTIONS TO SUPPRESS

The basic issue raised by the Defendants in their Motions to Suppress can be expressed by the following question: May the United States Coast Guard legally and constitutionally board a stateless vessel (which vessel is carrying contraband intended for delivery in the United States) while the vessel is in international waters, arrest the crew for conspiracy to violate the laws of the United States and seize its illicit cargo? In light of the applicable case law, the answer to the above question must be a firm and unequivocal yes.

■ Before discussing the issue further, however, this Court first wants to expressly declare that, on the basis of the evidence presented to it, it is holding that the SUPERFLY II was a stateless vessel.[26] The following factors clearly support this legal conclusion: the manner in which the name of the ship was painted on a board and not permanently affixed to the vessel; the lack of a hailing or home port painted on the vessel, with the newness of the paint in the stern area indicating the possibility that the hailing port had been painted over; and, finally, the fact that the ship was not registered to Panama, although it was flying a Panamanian flag and was claimed by the crew to be a Panamanian vessel.

■ By virtue of the provisions of 14 U.S.C. § 89(a),[27] the Coast Guard is empow-

---

**26.** Nothing introduced during the trial would change this Court's legal conclusion as to the statelessness of the SUPERFLY II. The record indicates that the SUPERFLY II was last registered in the Bahamas, but that that registration was terminated. It is also known that the SUPERFLY II is not registered in either the United States or Panama. Therefore, it would be difficult to reasonably dispute the conclusion that, in the terminology of the Convention on the High Seas, the SUPERFLY II was a "ship without nationality;" i. e., a stateless vessel.

**27.** 14 U.S.C. § 89(a) provides in relevant part as follows:

The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection and suppression of violations of laws of the United States. For such purposes, commissioned, warrant and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a

ered to make inquiries of, examine, search and seize any vessel on the high seas that is subject to the jurisdiction of or the operation of any law of the United States. As noted in *United States v. Cadena, supra,* this statute is not limited to domestic vessels, and jurisdiction over the offense charged confers authority under § 89(a) to search and seize foreign vessels on the high seas. *Cadena, supra,* at 1259. As further noted in *Cadena,* 21 U.S.C. § 963 has been applied extraterritorially and to nonresident aliens. *Cadena, supra,* at 1259, *citing United States v. Winter, supra.* Thus, the Coast Guard may, when it has probable cause to do so, detain and search a vessel on the high seas to detect and prevent a violation of the laws of the United States; when it does so, it acts in full accordance with the express purposes of § 89(a). *See Cadena, supra,* at 1259.

█ In the instant case, the Coast Guard had probable cause to believe that the SUPERFLY II was engaged in violation of this country's laws. The following factors, when considered in light of the Coast Guard's extensive and firsthand knowledge of the methods of operation utilized by seagoing smugglers, more than sufficiently support the conclusion that probable cause to search existed prior to the boarding of the SUPERFLY II: the manner in which the name of the SUPERFLY II was painted on a board and not permanently secured to the ship; the failure to have any hailing or home port painted on the vessel; the existence of what appeared to be new paint in the stern area, indicating that the hailing port had been recently painted over; the observation of extra fuel drums on the deck

of the ship; the fact that the ship was carrying more crewmen than normally carried on commercial vessels of similar type and size; the nearly complete circle made by the SUPERFLY II after the DURABLE's small boat returned to the DURABLE upon first communicating with the SUPERFLY II's crew; the fact that the SUPERFLY II was already far north of its declared destination and heading on a course that was taking it even further north of this avowed destination and directly toward the Texas coast; the oft-heard story given by the SUPERFLY II's crewmen about the master of their vessel having left the ship in a small raft, even though the SUPERFLY II was far from any land mass and no small craft had been observed by either the DURABLE or its reconnaissance helicopter; and, finally, the fact that the ship was not registered to the nation of Panama, although the Panamanian flag had been raised by the crew and declarations had been made by the crew that the ship was a Panamanian vessel.

Even if one assumed that probable cause did not exist prior to the actual boarding and subsequent detection of the strong odor of marijuana, the boarding of the SUPERFLY II was still justifiable under the provisions of § 89(a). In the case of *United States v. Cortes,* 588 F.2d 106 (5th Cir. 1979), a very similar fact situation occurred involving the vessel PITER: the PITER was flying no flag, it had no permanently-affixed name, and the crew gave a suspicious story about the departure of their captain.[28] In *Cortes,* on a fact situation

---

breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested . . .; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture . . . such vessel or such merchandise, or both, shall be seized.

**28.** It should also be noted that some nine days prior to the boarding of the PITER, another Coast Guard Cutter had approached the PITER

and inquired about her name, nationality and home port. At that time, the vessel raised a British Honduran flag and claimed to be from Belize, British Honduras. The Coast Guard operations center in Miami subsequently learned that no such ship was either registered in or had recently visited Belize. This information was apparently utilized in the later authorization to board the PITER. In the instant case, as in *Cortes,* the combination of factors leading to the actual boarding of the SUPERFLY II were more than sufficient to justify an investigation into the nationality of the SUPERFLY II.

appreciably less suspicious than that involved in the instant case, the Court of Appeals found that "ample reason" existed to investigate the PITER to determine its nationality and, if determined to be stateless, to take further appropriate action. *Id.,* at 109. The Court in *Cortes* noted that the actions of the Coast Guard were limited to "inquiries, boarding, and a limited search designed to elicit information about the vessel's identity and registration," and declared that stateless vessels are subject to that type of examination. *Id.,* at 109. In the instant case, the SUPERFLY II was a stateless vessel, and the actions taken by the Coast Guard were expressly and properly limited to a boarding and search initially designed to determine the nationality of the vessel. Therefore, under the teachings of both *Cadena* and *Cortes,* the Coast Guard had the statutory authority to stop, board and search the SUPERFLY II.

The statutory authorization applicable to the instant case is in no way curtailed by the Convention on the High Seas, 450 U.N. T.S. 82, 13 U.S.T. 2312, T.I.A.S. No. 5200. As a stateless vessel, the SUPERFLY II was:

> entitled to no protection under [the Convention's provisions]. Indeed, even had the [SUPERFLY II] been registered in Colombia, the nationality of its crew, the Convention would have provided defendants no comfort because Colombia is not a party. As we stated in *Cadena, supra,* 585 F.2d 1252 at 1261, 'There is no indication in the treaty, or elsewhere, that it was intended to confer rights on non-member nations or on vessels of non-member nations, let alone on citizens of non-member nations.'

*Cortes, supra,* at 109.

Furthermore, even if one assumed that citizens of a non-signatory nation could invoke the provisions of the Convention to restrict the rights of a party to the pact, the Coast Guard's actions *vis-a-vis* the SUPERFLY II in no way contravened any provision in the treaty. Article 22 of the Convention,[29] cited to by the Defendants in support of the argument that the Coast Guard acted outside the scope of its international authority, is limited by its very terms to the boarding and searching of foreign merchant ships, which ships are defined as vessels having the right to fly the flag they show. *Cortes, supra,* at 110; see *Cadena, supra,* at 1260, n. 15. In the instant case, the SUPERFLY II, flying a false flag, was a ship without a nationality, and as such not entitled to the protection afforded ships registered in a foreign nation which is a signatory of the Convention.

Finally, even if one assumed that the Defendants as individuals are entitled to protest violations of a treaty which their nation has failed to ratify, and further assumed that the provisions of the treaty had been violated, no basis exists for concluding that the violation thereof must or even should be rectified by blind application of the severe remedies of excluding evidence seized in violation of the treaty's provisions or dismissing indictments growing out of improper seizures. *Cadena, supra,* at 1261. As noted by the Court in *Cadena:*

> The violation of international law, if any, may be redressed by other remedies and does not depend upon the granting of

---

29. Article 22 of the Convention on the High Seas states in part:

1. Except where acts of interference derive from powers conferred by treaty, a warship which encounters a foreign merchant ship on the high seas is not justified in boarding her unless there is reasonable ground for suspecting:

    (a) That the ship is engaged in piracy; or
    (b) That the ship is engaged in the slave trade; or

    (c) That, though flying a foreign flag or refusing to show its flag, the ship is, in reality, of the same nationality as the warship.
2. In the cases provided for in sub-paragraphs (a), (b) and (c) above, the warship may proceed to verify the ship's right to fly its flag. To this end, it may send a boat under the command of an officer to the suspected ship. If suspicion remains after the documents have been checked, it may proceed to a further examination on board the ship, which must be carried out with all possible consideration.

what amounts to an effective immunity from criminal prosecution to safeguard individuals against police or armed forces misconduct. Article 22 of the Convention, for example, specifies the right to compensation for damages suffered as a consequence of its violation; if only this remedy is available to citizens or vessels of member nations, citizens of non-member nations ought not enjoy the benefits of greater prophylaxis, such as exclusion or dismissal of indictments, by virtue of their nation's failure to ratify. In the absence of a foreign state's ratification that would ensure reciprocal respect for these principles of international law, neither comity, domestic law, nor concepts of due process and fundamental fairness, require such a purging.

*Cadena, supra,* at 1261.

■ The conclusion that the boarding and searching of the SUPERFLY II by officers of the Government did not violate the confines of either domestic or international legal authority does not, of course, end the matter. The actions taken by the crew of the DURABLE must still be measured against the requirements of the Fourth Amendment; if the interests protected by that amendment were violated, then the exclusionary rule may properly be applicable even though there was no breach of any domestic statute or international convention. *See Cadena, supra,* at 1261, and *Cortes, supra,* at 110.

In any case involving Fourth Amendment issues, the Court determining the issues must first determine "whether the disputed search and seizure has infringed an interest which the Fourth Amendment was designed to protect." *Rakas v. Illinois,* 439 U.S. 128, 140, 99 S.Ct. 421, 429, 58 L.Ed.2d 387 (1978). Although *Rakas* did not deal with the question of who may have "standing" to contest the constitutionality of a stop, the Fifth Circuit has decided that before a foreign vessel [30] may be ordered to stop by officers of the Government, reasonable suspicion must exist that "criminal activity may be afloat." *Williams, supra,* at 214. In the instant case, there is no doubt that those aboard the DURABLE were aware of facts which justified reasonable suspicion that criminal activity "may be afloat." Indeed, as noted previously, those facts, considered together, warrant the conclusion that probable cause for a search existed prior to the actual boarding of the SUPERFLY II; at the very least, those facts legitimately and reasonably raised the suspicions of the experienced crew of the DURABLE.

■ In the case at bar, with regard to the contraband discovered in the hold of the SUPERFLY II, no one aboard that vessel can challenge the constitutionality of its seizure, since none of those aboard the SUPERFLY II had a legitimate expectation of privacy in the holds of the ship. As noted in *Williams, supra,* at 214, "[t]he cargo of a merchant vessel is subject to inspection when it leaves a port and when it returns to a port. Certainly, no crew member could assert a privacy interest in a cargo area subject to these inspections." The SUPERFLY II, as a coastal freighter, is subject to the same requirements as any other cargo vessel, and its crew cannot assert any privacy interest in the contents of its holds.[31]

---

**30.** The vessel involved in *Williams* was not flying the flag of her registry, but the stern indicated that she was a Panamanian vessel. Permission to board the ship was given by the nation of Panama. It is unclear whether the requirement that reasonable suspicion of criminal activity must exist before a foreign vessel can be ordered to stop applies to stateless vessels. For the purposes of the instant case, this Court will assume, without so holding, that it does.

**31.** Even if it is assumed that a crew member would have "standing" to challenge the

"search" of the hold, this Court concludes that the marijuana seized would be admissible into evidence under the plain view doctrine; i. e., evidence discovered in plain view, from a place where an officer is entitled to stand, is not the subject of a "search" within the meaning of the Fourth Amendment. *See United States v. Kaiser,* 545 F.2d 467, 477 (5th Cir. 1977). As noted in the body of this Memorandum and Order, the boarding party from the DURABLE was legally entitled to be aboard the SUPERFLY II. The inability of the crewmen to direct the boarding party to any documentation and the

The above conclusion involving "standing" to contest the seizure of the contents of the holds of the SUPERFLY II does not end this Court's inquiry into the constitutionality of the search and seizure conducted aboard that vessel. Other items of evidence were seized from various locations aboard the SUPERFLY II which could properly be said to be locations in which the crewmen had legitimate expectations of privacy. Since this is so, the next question which must be resolved was whether there was probable cause for the search combined with exigent circumstances justifying the failure to obtain a warrant. *See, Cortes, supra,* at 110.

■ In the instant case, the combination of probable cause and exigent circumstances attendant to a vessel capable of movement constitutionally justified the warrantless search of the SUPERFLY II. *See United States v. Weinrich,* 586 F.2d 481, 494 (5th Cir. 1978); and *United States v. Freeman,* 579 F.2d 942, 948 (5th Cir. 1978). Again, as noted and reiterated above, it is this Court's opinion that the facts known to the crew of the DURABLE concerning the physical condition of the SUPERFLY II, its location when compared to its stated destination, its movements after contact with the DURABLE, its flying of a false flag, its crew's claim of a false nationality, its being overmanned, and its movements after contact with the DURABLE were sufficient to permit the conclusion that probable cause to search existed prior to the actual boarding of the SUPERFLY II.

Even if it is assumed that no probable cause existed to search the SUPERFLY II prior to the detection of the strong odor of marijuana immediately upon the boarding party's entry upon the decks of the SUPERFLY II, the search is not constitutionally invalid. Under the circumstances of the DURABLE's contact with and observations of the SUPERFLY II, the boarding of that ship to establish its true identification was not unreasonable for Fourth Amendment purposes. *Cortes, supra,* at 111. The acts of the crew of the DURABLE are reasonably analogous to investigative stops authorized in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967). Once legitimately aboard, the odor of the marijuana, in addition to the crew's expressions of ignorance concerning the whereabouts of any ship documents, clearly gave the boarding party probable cause to search.

In addition to probable cause, it is this Court's opinion that exigent circumstances existed justifying the DURABLE's failure to obtain a search warrant prior to the search. The SUPERFLY II was fully operational and capable of proceeding at will prior to being boarded. In addition, during the period of contact before the actual boarding, the SUPERFLY II had twice taken what could fairly be described as evasive action. Therefore, this Court must conclude that the stopping, boarding and searching of the SUPERFLY II were legally valid acts, whether measured against the requirements of domestic statutes, international law or the Constitution of the United States.

Based upon the above, it is hereby

ORDERED that the Defendants' Motions to Suppress be in all things DENIED. It is further ORDERED that the Defendants' Motions to Dismiss based upon lack of jurisdiction be DENIED.

---

length of time a search of the entire ship would have taken justified the decision of Ensign Farrel to attempt to locate the ship's main beam number. In trying to enter the hull to carry out this decision, Ensign Farrel discovered bales of marijuana in plain view.